[No. 11575. In Bank. — December 1, 1887.]

GEORGE E. BATES, Appellant, v. JAMES N. POR-
TER, Treasurer of the City of Sacramento,
Respondent.

City of Sacramento — Bonded Indebtedness — Sinking Fund — Revenue
Derived from Water Rates — Gross Receipts. — The act of April
24, 1858, incorporating the city and county of Sacramento, and repealing
the prior acts incorporating the city of Sacramento, provides in effect
that fifty-five per cent of the revenue derived from and within the city
limits for municipal purposes, from certain sources, including water
rates, when paid into the treasury, should be set apart and appropriated
to an interest and sinking fund, which should be exclusively devoted to
the payment of the annual interest and the final redemption of bonds
issued for city indebtedness; that twelve per cent of such revenue should
be appropriated to a salary fund, for the payment of salaries of municipal
officers, and the balance to other funds in a manner stated. *Held*, that
the word "revenue," as used in the act, meant the gross receipts derived
from the water rates, and not the net receipts, after deducting therefrom
the various items of expense incurred in conducting the water-works,
and that consequently the treasurer was bound to set apart and appro-
priate to the interest and sinking fund fifty-five per cent of the gross
receipts so derived.

Id. — Contract with Bond-holders — Subsequent Legislation cannot
Impair. — The provisions of the act of 1858, for the payment into the
interest and sinking fund of fifty-five per cent of the revenue derived
from water rates, constitute a part of the contract between the city of
Sacramento and its bond-holders, which could not be changed to the
hurt of the bond-holders by subsequent legislation of any sort.

Id. — Mandamus against Treasurer — Payments Made for Unau-
thorized Purpose. — The treasurer of the city of Sacramento cannot
be compelled by *mandamus* to set apart and appropriate to the interest
and sinking fund any portion of the fifty-five per cent of the revenue
derived from the water rates, which had been previously paid out of the
treasury upon warrants drawn by the auditor, in payment of bills which
had been audited by the board of trustees of the city, but which were not
payable out of such fund.

Appeal from a judgment of Superior Court of Sacra-
mento County.

The facts are stated in the opinion of the court.

*W. C. Belcher*, and *Freeman, Bates & Rankin*, for Appellant.

The act of April 24, 1858, forms a contract between the city of Sacramento and its creditors which could not be repealed or modified. (*Meyer* v. *Brown*, 65 Cal. 583; *Freehill* v. *Chamberlain*, 65 Cal. 603; *Louisiana* v. *Pilsbury*, 105 U. S. 278; *Beaulieu* v. *Pleasant Hill*, 14 Fed. Rep. 222; Cooley on Constitutional Limitations, 292.) The provisions of this act, under which the bonds were issued, conclusively establish that fifty-five per cent of all water receipts should be paid into the interest and sinking fund.

*A. P. Catlin*, and *W. A. Anderson*, for Respondent.

THORNTON, J.—This is an application for a writ of mandate to command the respondent to set apart and appropriate to a fund known as the sinking fund fifty-five per cent of all moneys received by him, collected for water rents in the city of Sacramento.

It is urged on behalf of respondent that the treasurer is bound to set apart the net receipts of the moneys above mentioned; that is, what remains of such receipts after deducting therefrom various items of expense in conducting the water-works, including salaries of its officers and employees. The contention of appellant is, that the respondent is bound to set apart the gross receipts, without deducting anything.

We are of opinion that the contention of appellant is sustained by the law, which we shall proceed to show.

The city of Sacramento was incorporated by an act passed on the 27th of February, 1850. (See Stats. 1850, p. 70.) This act is referred to in the opinion in the case of *Meyer* v. *Brown*, 65 Cal. 583, and some of the features of the organization of the city are there detailed. (See 65 Cal. 584.) This act was amended as to the fifth and twentieth sections, at the same session of the legislature,

by an act passed on the 26th of March, 1850. (Stats. 1850, p. 96.) By an act passed in 1851 (Stats. 1851, p. 391), which became a law by permission of the governor, who neither approved nor vetoed the bill, a new act of incorporation was enacted. This act repealed the former acts above mentioned. (Sec. 44, Act of 1851, p. 401.) The act of 1851 was modified by the act of April 28, 1852 (see Stats. 1852, p. 190), by amending the seventh and sixteenth sections thereof. On May 3, 1852 (Stats. 1852, p. 196), an act was passed authorizing the mayor and common council of the city to contract, by special ordinance, in such manner as they might choose, with any association, person, or persons, to supply the said city with water, the act declaring that "any contract or contracts so made and entered into shall be valid and binding in law." The act of 1851 above mentioned was again amended in 1855 by the act of the 31st of March. (Stats. 1855, p. 63.) By section 9 of this act the common council was empowered, on their first meeting after a general election, or as soon thereafter as the same could conveniently be done, to appoint, in such manner as the council might prescribe, the following officers, *inter alios*, to serve during the pleasure of the council, to wit: one superintendent of water-works, and one engineer of water-works, the salary of the latter officer not to exceed one hundred and fifty dollars per month. By section 4 of this act, amending section 30 of the act of 1851, the salary of the superintendent of the water-works was fixed at two thousand dollars per annum. (Stats. 1855, p. 64.) By section 12, provision was made for the collection of water rents by the city collector, with power in the common council, by ordinance, to require the superintendent of the water-works to collect the water revenue. (Stats. 1855, p. 66.) The powers conferred in the act of incorporation of the city on the city council (see act of 1851, sec. 7, Stats. 1851, p. 393, and the amendatory act of 1852, p. 195, amending section 7 of the act of 1851), and the act of

May 3, 1852, above stated, confer ample power on the authorities of the city of Sacramento to erect and maintain water-works, and to charge and collect water rents.

Frequent references in subsequent acts of the legislature are made to the water-works as existing and the revenue arising therefrom in the shape of water rents. These may be found by examining the statutes. On the point of authority in the city authorities in the matter of erecting and maintaining the works above mentioned and to collect water rents, therefore, it is unnecessary to make more particular reference to these enactments. All the statutes affecting the city and county of Sacramento may be found mentioned in 2 Hittell's General Laws, pp. 970–972.

Early in its existence the city became indebted. It had power to borrow money which it had used for purposes not improper, and it had creditors who, as is usually the case, demanded payment. Provision was made by the legislature empowering the city to fund its indebtedness, and to issue bonds therefor. The legislation on this subject, so far as regards the case in hand (for the action here was brought by a creditor and bondholder of the city), will be referred to in the further progress of this opinion.

The main question in this case turns upon the construction of the act of April 24, 1858. (Stats. 1858, p. 267.)

This act is entitled "An act to repeal the act passed March 26, 1851, entitled, 'An act to incorporate the city of Sacramento,' and the several acts amendatory and supplementary thereto, and to incorporate the city and county of Sacramento."

By its first section, the city and county of Sacramento was consolidated; and for the government of the territory, then known as the city and county of Sacramento, there was created a board of supervisors, and this board of supervisors and their successors in office it was

declared should be a body politic and corporate, under the name and style of " The City and County of Sacramento," and by that name shall be known in law. It was in the same section invested with extensive powers.

It was further provided in the same section that " the city and county shall not be sued in any action whatever, nor any of its lands, buildings, improvements, property, franchises, taxes, revenues, actions, choses in action, and effects, be subject to attachment, levy, or sale, or any process whatever, either mesne or final."

By the second section of this act, the corporation constituted by it was made the successor of the corporation by this act dissolved, and heretofore known as " The Mayor and Common Council of the City of Sacramento." It was declared to be the owner of all the property, actions, rights of action, moneys, revenues, income, and trusts at that time vested in or belonging or in any wise appertaining to the corporation known as " The Mayor and Common Council of the City of Sacramento."

The act of 1858 contains, *inter alios*, the following sections:—

" SEC. 12.   The treasurer of said city and county shall receive and safely keep in a secure, fire-proof vault, to be prepared for the purpose, all moneys belonging to or which shall be paid into the treasury, and shall not loan, use, or deposit the same, or any part thereof, with any banker or other person, nor pay out any part of said moneys, except upon demands authorized by law, and after they have been duly audited and ordered paid. He shall keep the key of said vault, and not suffer the same to be opened except in his presence.   At the closing up of the same each day, he shall take an account, and enter in the proper book the exact amount of money on hand; and at the end of every month he shall make and publish a statement, in one of the daily papers published in the city of Sacramento, of all receipts into and payments from the treasury, and on what account.   If he

violate any of the provisions of this section, he shall be considered a defaulter, and shall be deemed guilty of a misdemeanor in office, and he shall be liable to removal, and shall be proceeded against accordingly; if he loan or deposit said moneys, or any part thereof, contrary to the provisions of this section, or apply the same to his own use, or to the use of any other person, in any manner whatsoever, or suffer the same to go out of his personal custody, except in payment of audited demands upon the treasury, he shall be deemed guilty of felony, and on conviction thereof shall suffer imprisonment in the state prison for a period not less than three nor more than ten years.

"Sec. 13.   The treasurer shall keep the moneys belonging to each fund separate and distinct, and shall in no case pay demands chargeable against one fund out of moneys belonging to another.   The said treasurer shall give his personal attendance at his office during office hours; and if he absent himself therefrom, except on account of sickness or urgent necessity, he shall lose his salary during his absence.   For the purpose of collecting licenses he may employ a deputy, whose compensation shall be fixed by the board of supervisors, at a rate not exceeding five dollars per day. when necessary and actually employed."

"Sec. 16.   Every demand upon the treasury, except the salary of the auditor, and including the salary of the treasurer, must be acted on by the board of supervisors, and allowed or rejected in the order of presentation, and must, after having been approved by the board of supervisors, before it can be paid, be presented to the auditor of the city and county to be allowed, who shall satisfy himself whether the money is legally due and remains unpaid, and whether the payment thereof from the treasury is authorized by law, and out of what fund.   If he allow it, he shall indorse upon it the word 'allowed,' with the name of the fund out of which it is payable,

with the date of such allowance, and sign his name thereto. No demand shall be approved, allowed, audited, or paid, unless it specify each several item, date, and value composing it, and refer to the law, ordinance, contract, or authority, by title, date, and section, authorizing the same; provided, that in all cases demands shall be paid in the order of their approval by the board of supervisors.

"SEC. 17. The auditor must number and keep a record of all demands allowed by him, showing the number, date, date of approval, amount, and name of the original holder, on what account allowed, and out of what fund payable. The demand of the auditor on account of his monthly salary may be audited and allowed by the board of supervisors. The auditor is required to be constantly acquainted with the exact condition of the treasury and every lawful demand upon it, and shall report to the president of the board of supervisors on the Monday of each week, or oftener if required, the condition of each fund in the treasury. He shall keep a complete set of books for the city and county, in which shall be set forth, in a plain and business-like manner, every money transaction of the city and county, so that he can, at any time when requested, tell the state of each and every fund, where the money came from, to what fund it belonged, and how and for what purpose it was expended, and also the collections made and the money paid into the treasury by each and every officer. He shall issue all licenses and permits, except as otherwise provided in this act, and countersign all warrants on the treasury. And until the general election in the year 1859, he shall receive for his compensation at the rate of three thousand dollars per annum, payable from the salary fund, as provided in section 36 of this act.

"SEC. 18. No demand upon the treasury shall be allowed by the auditor, or approved by the board of supervisors, in favor of any person or officer in any man-

ner indebted thereto, without first deducting the amount of such indebtedness, nor to any person or officer having the collection, custody, or disbursement of public funds, unless his account has been duly presented, passed, approved, and allowed, as required in this act; nor in favor of any officer who shall have neglected to make his official returns or his reports, in writing, in the manner and at the time required by law, or by the regulations established by the board of supervisors; nor to any officer who shall have neglected or refused to comply with any of the provisions of this or any other act of the legislature regulating the duties of such officer, on being required in writing to comply therewith by the president of the board of supervisors or the supervisor of his respective district."

" SEC. 28. Every officer or other person having the control, collection, or custody of any money collected for taxes, licenses, water rents, fees of office, or for any other account not otherwise herein provided, shall pay the same into the treasury on the Saturday of each week, and shall on the same day file the treasurer's receipt with the auditor, and shall at the same time file with the auditor a statement, under oath, of the sources from whence the money came, and that the money so paid over is the total amount collected since his last payment; and such statement shall also be filed in duplicate with the clerk of the board of supervisors. If the county clerk, recorder, sheriff, clerk of water-works, harbor-master, or any other officer or person having the control or custody of any money collected for or belonging to the state or city and county, or any money collected for fees which this act provides shall be paid into the treasury, shall fail or neglect to pay over the fees or moneys collected by him, as required by the preceding section, or shall fail to make his affidavit, he shall forfeit his office; and it shall be the duty of the auditor to inform the president of the board of supervisors in writing of

such failure; and at the next meeting of said board after the said president shall receive such information, the said board shall enter an order requiring such officer to show cause, on a certain day, why such office should not be declared vacant; and, upon the return day of such order, or at such time as the matter may be adjourned to, they shall proceed to hear and determine the matter; and if such officer shall be found guilty of such failure, his office shall be declared vacant."

" SEC. 34. The board of supervisors shall not have power to levy any greater taxes than as follows, viz.: On the real and personal estate, except such as is exempt by law throughout the city and county, a tax of one hundred cents on the one hundred dollars; such state taxes as the laws may require, and in addition thereto they shall levy for municipal purposes on all real and personal property within the city limits, except such as is exempt by law, a tax of one hundred cents on the one hundred dollars; also a tax for road purposes of five cents on the one hundred dollars on the property outside the city limits. All of which taxes shall be levied and collected strictly in accordance with the revenue laws of the state, except as may be otherwise provided in this act; *provided,* that nothing contained in this section shall prevent the board of supervisors from levying, in addition, a tax in accordance with an act passed February, 1858, entitled an act to amend an act passed April 27, 1857, entitled an act to submit to the people of the counties of Sacramento and El Dorado a proposition for the construction of a wagon-road.

. "SEC. 35. The revenue derived from and within the city limits for municipal purposes, viz., taxes, licenses, harbor dues, water rents, and fines collected in the mayor's court, or otherwise, when paid into the treasury, shall be set apart and appropriated as follows: Fifty-five per cent to an interest and sinking fund, which shall

be applied for the payment of the annual interest and the final redemption of bonds issued for city indebtedness, in accordance with the provisions of this act; fifteen per cent to a salary fund, which shall be applied to the payment of the salaries of municipal officers, as provided in this act; eight per cent to a school fund, which shall be applied to the support of schools within the city limits; and the balance, twenty-two per cent, to a fund to be used for all such necessary municipal expenses as are not otherwise provided for in this section, and shall be called the ' contingent fund.'

" SEC. 36.   The revenue collected or accruing prior to the first day of January, 1859, throughout the city and county, except such as may be collected for municipal purposes within the city limits, is hereby set apart and appropriated as follows, viz.: Twelve per cent to a school fund, to be used for school purposes, as provided by law; eight per cent to the pauper and indigent sick fund; eighteen per cent to the salary fund; twelve per cent to the contingent fund; and the balance to a general fund, which shall be applied to the payment of the outstanding auditor's warrants lawfully drawn on the treasury and payable in the order of their registry; and of the revenue accruing and collected for the county after the first day of January, 1859, when paid into the treasury, twenty-five per cent shall go to the interest and sinking fund; ten per cent to the school fund, eight per cent to the pauper and indigent sick fund, twenty-five per cent to the salary fund, and the balance, thirty-two per cent, to the general fund, all of which shall be exclusively applied to the several purposes for which such funds were set apart; and if, at the close of any fiscal year, there shall remain a surplus in either of the funds mentioned in section 35, such surplus moneys shall be transferred to the interest and sinking fund provided in such section 35; and if a surplus shall be found at the end of any fiscal year in either fund mentioned in section 36, such

surplus shall be transferred to the interest and sinking fund mentioned in said section 36; and any transfer of any sum or surplus from one of the funds mentioned in section 35 and section 36 to another fund, made at any other time or in any other manner than as provided in this act, is hereby strictly prohibited; and any violation of such provision on the part of any officer shall constitute a misdemeanor punishable by fine of not less than five hundred dollars or imprisonment in the county jail not less than three months. All money now in the treasury shall be appropriated as provided in this section.

"SEC. 37. For the purpose of liquidating, funding, and paying the claims against the city and county of Sacramento hereinafter specified, the treasurer shall cause to be prepared suitable bonds of the county of Sacramento not exceeding the sum of six hundred thousand dollars, and for the city of Sacramento not exceeding the sum of one million six hundred thousand dollars, bearing interest at the rate of six per cent per annum from the first day of January, 1859, and payable at the office of the treasurer. Said claims shall be funded in the order of their reception; shall, in the order of reception, be entitled to the shortest time; and one fourth of the whole amount made payable on the first day of February, 1888, one fourth on the 1st of February, 1893, one fourth on the 1st of February, 1898, and the balance on the 1st of February, 1903. The interest on said bonds shall be made payable at the office of the treasurer on the first day of January of each year. Said bonds shall be signed by the president of the board of supervisors, countersigned by the clerk of the board of supervisors, and indorsed by the treasurer, and shall have the seal of the city and county affixed thereto. Coupons for the interest shall be attached to each bond, so that they may be removed without injury to the bond; said coupons, consecutively numbered, shall be signed

by the treasurer. It shall be the duty of the book-keeper of the city and county, and the treasurer, each, to keep a separate record of all bonds issued, showing the number, date, and amount of each bond, to whom issued, upon what claim, and its amount; and none of the claims herein specified shall be liquidated or paid except in the manner herein provided.

" SEC. 38. The following claims shall be received and funded under the provisions of this act: 1. All legal debts or liabilities against the county of Sacramento which may be unpaid and unprovided for by this act on the first day of January, 1859. The annual interest and principal of all bonds issued for claims mentioned in this section shall be paid from the interest and sinking fund, as provided in section 36, and in the manner otherwise provided in this act. 2. All legal debts or liabilities against the city of Sacramento which may be unpaid and unprovided for by this act on the first day of January, 1859. The annual interest and principal of all bonds issued for claims against said city shall be paid from the interest and sinking fund provided in section 35, and in the manner otherwise provided in this act."

By section 24, the salaries of certain officers are fixed; and it was declared that these salaries shall be paid out of the salary fund provided in the act. (See secs. 35, 36, Stats. 1858, p. 279.)

The salaries of the president, members, and clerk of the board of supervisors, county auditor, and treasurer were to be paid, one half out of the salary fund provided for in section 35, and one half out of such fund in section 36 of the act; and the salaries of the sheriff, county clerk, assessor, district attorney, county judge, and superintendent of public schools were to be paid out of the salary fund provided for in section 36.

By the last clause of section 24 it was provided that " all municipal officers shall be paid out of the salary fund provided for in section 35 of this act."

Among the officers mentioned in section 24 are clerk and engineer of the water-works. Laborer at water-works is also mentioned. The salary of the clerk is fixed at fifteen hundred dollars per annum, of the engineer at the same sum, and the pay of the laborer at seventy-five dollars per month. The board of supervisors is, by section 7 of the act, empowered to elect a clerk and engineer of water-works. These are of the municipal officers who are to be paid out of the salary fund provided in section 35. The laborer of the water-works is doubtless to be paid out of the same fund.

It will be seen that all moneys collected by any officer who has the control, collection, or custody of any money collected for taxes, licenses, *water rents*, fees of office, or any other account not otherwise provided in the act, *are required to be paid into the treasury* on the Saturday of each week. (Sec. 28.) This duty is enforced under the heaviest penalties, which are prescribed by section 28.

It must be further observed that the revenues of the city and county are set apart and appropriated to certain funds therein mentioned. By section 35 *the revenue* derived from and within the city limits for municipal purposes is to be set apart and appropriated as follows: 1. Fifty-five per cent to an interest and sinking fund; 2. Fifteen per cent to a salary fund; 3. Eight per cent to a school fund; 4. Twenty-two per cent to a contingent fund.

A perusal of section 36 will show the funds created by that section and the distribution to be made between them. But let it be noted that of the sinking and interest fund of section 35 (fifty-five per cent of the revenue mentioned therein) it is enacted in these words, "which shall be applied to the payment of the annual interest of and final redemption of bonds issued for city indebtedness, in accordance with the provisions of this act." (Sec. 35.)

The most cursory perusal of sections 35 and 36 will

show that the funds therein mentioned were to be devoted strictly and exclusively to the payment of the demands on them as defined by the act.

The revenue mentioned in section 35, derived from and within the city limits for municipal purposes, is clearly defined by section 35, as follows: "Taxes, licenses, harbor dues, *water rents*, and fines collected in the mayor's court, or otherwise," and "when paid into the treasury," they shall be set apart and appropriated to the several funds as set forth above.

It should be further noted that the annual interest and principal of all bonds issued for claims against the city of Sacramento are, by section 38, to be paid *from the interest and sinking fund*, provided in section 35 of the act. By this means the interest and sinking fund thus created is exclusively devoted to the payment of the interest and principal of the bonds mentioned.

The plaintiff in this action is the holder of such bonds issued under the act of 1858.

The act of 1858 was before this court in *Meyer v. Brown*, 65 Cal. 583, and it was there held to be a contract between the bond-holders and the city of Sacramento which could not be changed to the hurt of the bond-holders by subsequent legislation of any sort. The court, in its opinion, drawn up by Justice Ross, after quoting several sections of the act, among others section 35, and referring to others, said:—

"Having thus made provision for the payment annually of the interest on the bonds, and ultimately for their redemption, the legislature offered them in payment of the legal claims against the old city government. The offer was accepted, and the holders of the latter surrendered their claims, in consideration of which the consolidated government issued to them its bonds, pursuant to the provisions of the act. The bonds carried with them the pledge of an annual tax for municipal purposes on all real and personal property within the

city limits, except such as is exempt by law, of one hundred cents on the one hundred dollars, fifty-five per cent of which to be set apart and appropriated to an interest and sinking fund, to be applied to the payment of the annual interest upon the bonds and to their final redemption. The tax was the chief security offered the creditors as an inducement to accept the bonds in payment of their claims. When the bonds for whose payment, with interest, provision was thus made were issued and accepted by the creditors of the old city government, a contract was made as solemn and binding and as much beyond subsequent legislation as it would have been if made between private persons. These views will be found sustained and amplified in an able opinion recently rendered by the supreme court of the United States in a case entitled *Louisiana* v. *Pilsbury,* reported in 105 U. S. 278."

This should be regarded as settling the law on this point.

Regarding it, then, as settled to be a contract between the city and the bond-holders, the question arises as to the terms of this contract. The point, then, to be considered is, whether this contract extends to and embraces within its terms the gross receipts from *water rents,* or does it only include the net receipts after deducting salaries, expenses, etc.? This must be determined by the language of the act.

That part of the act to which our attention is particularly called is the first clause of section 35. That clause is as follows: —

" The revenue derived from and within the city limits for municipal purposes, viz., taxes, licenses, harbor dues, water rents, and fines collected in the mayor's court, or otherwise, when paid into the treasury, shall be set apart and appropriated as follows," etc. The section then proceeds to designate the funds, as stated above.

Now, it is said that the word "revenue" is defined by Worcester to mean,—"1. Income or annual profit received from lands or other property"; and "2. The income of a nation or state derived from the duties, taxes, and other sources for the payment of the national expenses"; and we are referred to the definitions given by Bouvier and Burrill. Webster gives several definitions, as follows: "1. That which returns, or comes back, from an investment; the annual rents, profits, interest, or issues of any species of property, real or personal; 2. Hence, return, reward, as a rich *revenue* of praise; 3. The annual product of taxes, excise, customs, duties, rents, etc., which a nation or state collects and receives into the treasury for public use."

According to the last definition given by Webster, the annual produce of taxes, excise, customs, duties, *rents* collected and received into the treasury for public use is revenue. Then whatever of taxes is received into the treasury is revenue; and this accords with the contention of appellant here.

Bronson, J., in explaining the word "income," used in a statute, in *People* v. *Supervisors of Niagara*, 4 Hill, 23, said:—

"It is undoubtedly true that 'profits' and 'income' are sometimes used as synonymous terms; but, strictly speaking, 'income' means that which comes in, or is received from any business or investment of capital, without reference to the outgoing expenditures; while 'profits' generally mean the gain which is made upon any business or investment when both receipts and payments are taken into the account. 'Income,' when applied to the affairs of individuals, expresses the same idea that "revenue" does when applied to the affairs of a state or nation; and no one would think of denying that our government has any revenue because the expenditures for a given period may exceed the amount of receipts."

The word " revenue " is used in many senses. It is, like thousands of words in our language, ambiguous in meaning, the significance of which can only properly be determined by the words with which it is connected. Let it be conceded that the usual and ordinary meaning of the word, when used alone, is " net income,"—that which remains of the annual income of property after deducting from gross receipts the expenses incurred in producing the gross income,—still we must resort to the context to find the sense in which it is used in the writing presented for interpretation. If the context indicates a meaning different from its ordinary and popular signification, we must adopt the meaning so indicated; that is, indicated by the words of the statute or instrument in which it is used.

And here the context clearly denotes its meaning. It is the revenue derived from water rents collected and paid into the treasury which is spoken of. It is so said in the thirty-fifth section. By section 28, all water rents are to be paid into the treasury. None can be held back. The collecting officer who fails to pay in all the water rents forfeits his office. This officer must pay into the treasury all such moneys on Saturday of each week, and must on the same day file the treasurer's receipt for such payment with the auditor, and shall at the same time file with the auditor a statement, under oath, of the sources from whence the money comes, and that the money so paid over is the total amount collected since his last payment; and such statement shall also be filed in duplicate with the clerk of the board of supervisors. The above provisions are enacted in section 28 of the act of 1858, quoted above in full. The penal provisions above referred to follow in the succeeding part of section 28.

The word " revenue " has the same meaning in section 36.

The intent is a plain one. That the above represents its terms and stipulations we have no doubt. Any act

or acts of the legislature making any change in it to the detriment of the creditor without the consent of the bond-holder are utterly void. This court so held in *Meyer* v. *Brown*, *supra*, and still adheres to that judgment.

Much is said as to the expense of constructing the water-works, and that the city has been obliged to build a new water-works. We cannot hold that any such considerations can alter the contract or abridge the right of the creditor. The payment of the expenses of conducting the works is provided for in the act.

The officers and employees are salaried (section 24), and there is a fund, called a salary fund, created for their payment (see section 35); and it is declared of the salary fund that it " shall be applied to the payment of the salaries of municipal officers as provided in the act"; and for all other expenses, if any there shall be, a contingent fund of twenty-two per cent of the taxes, licenses, harbor dues, water rents, etc., is provided for their payment.

Of this it may be said that if the funds provided for in the act are not sufficient to pay such expenses, resort must be had to the legislature to procure further powers to raise the money by a constitutional act of that body, which is not allowed by any act to divert from the interest and sinking fund any portion of it without the consent of the creditor.

As to the new water-works, and the payment of the expense of building them, it may be said that the act of 1858 has no reference to such a matter. If new water-works had to be built, the legislature could provide for their erection without interfering with the funds set apart for the payment of the bonds; and if it did not do so, the act must stand as it passed. It would not be held that if a person mortgaged the gross proceeds of his farm to his creditor that he could take part of these funds to build a new house, when the old one, from decay, had

LXXIV. CAL.—16

fallen, and ceased to be habitable, without the consent of the creditor. Or if fertilizers were required to make his farm productive, that he could spend any portion of the gross proceeds to purchase the fertilizing material.

The necessities of the farmer may have great weight with his mortgagee, and induce him to consent to the expenditure, but the contract would bind him without such consent.

It is hardly necessary to refer to the position that for a long time the bond-holder consented to a withholding of the moneys due him. The embarrassment of the city may have induced this waiting on the part of the bond-holder; but we know of no rule of law which would authorize us to hold that this conduct on the part of the bond-holder abridged or altered his rights under the contract as made.

The foregoing conclusions are strengthened by the fact that the bond-holder took his securities without the right to sue the city and county. (Sec. 1.) The city had no existence as a corporation after the act took effect, and could not, therefore, be sued.

In accordance with the foregoing views, the judgment must be reversed.

The prayer of the complaint, which was filed on the 29th of January, 1886, is as follows:—

"Wherefore, this petitioner prays that a writ of mandate issue from this court, ordering and directing the respondent, the treasurer, James N. Porter, to set apart and appropriate to said interest and sinking fund fifty-five per cent of the amount received from the water rents since the first Monday in April, 1885, and for general relief in the premises, and for costs.

"Also, that the respondent, as treasurer as aforesaid, be ordered and directed, from time to time, as money collected from water rents is received by him as treasurer, to set apart and appropriate fifty-five per cent thereof to the interest and sinking fund of said city."

The court, among other facts, finds the following:—

"That since the first Monday in April, 1885 (the beginning of the fiscal year for the city of Sacramento), and prior to the filing of petitioner's petition herein, there had been collected for water rents within the city of Sacramento the sum of $43,763.15, and said sum had been paid to the respondent as treasurer of said city

"Of this sum there has been set apart and appropriated to the interest and sinking fund the sum of $6,600, which sum is fifty-five per cent of the amount remaining of said sum of $43,763.15, after paying all expenses, including salaries, of operating and maintaining the water-works of said city.

"That all of said $43,763.15, except the said sum of $6,600, and except $5,400 paid to other funds, the balance, to wit, $31,763.15, was paid out by said treasurer upon warrants drawn by the auditor to pay bills for the expenses of carrying on said water-works, which bills were audited and allowed by the board of trustees."

It appears from this finding that the sum of $43,763.15 had, since the first Monday in April, been collected for water rents, and paid into the treasury. Of this sum, $6,600, fifty-five per cent of the amount, remained "after paying all expenses," including salaries of operating and maintaining the water-works. That of this larger sum, except $6,600 and $5,400 paid to other funds, all of it had been paid out by the treasurer upon warrants drawn by the auditor, to pay bills for the expense of carrying on the water-works, which bills were audited by the board of trustees.

That the creditors were entitled to have fifty-five per cent of the sum of $43,763.15 set apart to the interest and sinking fund under the law, we have no doubt. But all the money, except the sums mentioned, has been paid out as above stated; and though it was a violation of law and of the rights of the bond-holders, such wrong cannot be redressed in thi~ ~ction. That portion of the

prayer of the complaint cannot then be granted. The only relief which we can grant is to command the treasurer, as money collected from the water rents above-mentioned is, from time to time, paid to and received by him as treasurer, he shall set apart and appropriate fifty-five per cent of all such moneys, without any deduction whatsoever, to the interest and sinking fund of the city of Sacramento.

The judgment is reversed, and the cause remanded to the court below, and said court is directed to enter judgment as above stated.

Ordered accordingly.

TEMPLE, J., McKINSTRY, J., and SHARPSTEIN, J., concurred.

PATERSON, J., dissenting.—I dissent. The legislative acts, upon which petitioner bases his demand for a writ of mandate herein, are fully set forth in *Meyer* v. *Brown*, 65 Cal. 584.

The court did not in that case define the word "revenue" as used in the act of 1858. In this case the meaning of that word is the main question in the controversy.

By an act approved and which took effect May 20, 1861, section 35 was amended by adding the following provision: "Provided, however, that all moneys received from water rents shall be applied, so far as may be necessary, to the payment of the current expenses of the water-works, exclusive of the salaries and fees of the officers thereof, and the balance, if any, shall be distributed as is hereinafter in this section provided."

The act of April 25, 1863, repealed the act of April 24, 1858, consolidating the city and county governments, and the acts amendatory thereof, and emancipated the one from the other, and incorporated the "city of Sacramento." In section 26 of this act the

language of section 35 of the act of 1858 is used, except that the word "net" is inserted before the words "water rents," and in section 27 it is provided that, —

"All revenues derived from the water-works shall be paid into a fund to be known as the 'water-works fund,' and at the end of every three months, after the payment of all necessary expenses, including salaries, to carry on and keep in order the said water-works, it shall be the duty of the auditor to apportion the residue, if any there may be, in the same proportions as the other funds of the city, provided in section 26." (Stats. 1863, p. 426.)

The court found that "from and after the twenty-fifth day of April, 1863, there has been apportioned to the interest and sinking fund only fifty-five per cent of the amount of moneys collected from water rents, which remained after the payment of all expenses, including salaries, to carry on and keep in order the water-works, as is provided for by the act of April 25, 1863, referred to in the pleadings in this cause."

Assuming that the meaning of the word "revenue" must be gathered from the provisions of the act of 1858, it is by no means clear that it was intended to be there used in the sense claimed for it by appellant. "Revenue" and "income" are used interchangeably. Thus Bouvier defines "revenue" to be "the income of the government arising from taxation, duties, and the like" and defines "income" by saying, "the word 'income' means the gain which proceeds from property, labor, or business; it is applied particularly to individuals; the income of the government is usually called revenue." Burrill says it is "that which returns or is returned; a rent, income; amount of profit received from lands or other property." He defines "income" to be, "in a strict sense, that which comes in or is received from any business or investment of capital without reference to the outgoing expenditures. In a looser sense, income is used as synonymous with profits."

Under a will which required the executor to pay the income of the estate to the widow during her life, Chief Justice Shaw decided that "the 'income' mentioned in the will must be considered the *net* income, after deducting the taxes, repairs, and ordinary current expenses attending the estate, from the gross receipts for rents." (*Watts* v. *Howard,* 7 Met. 482.)

In *Andrews* v. *Boyd,* 5 Greenl. 202, the court said: "It does not appear to us that any fair distinction can be raised between 'income' and 'net income.' 'Net' is a term used among merchants to designate the quantity, amount, or value of an article or commodity after all tare and charges are deducted. The income of an estate means nothing more than the profits it will yield after deducting the charges of management, or the rent which may be obtained for the use of it. The rents and profits of an estate, the income or the net income of it, are all equivalent expressions."

In view of the uncertainty as to the meaning the legislature intended to attach to the word "revenue" in the act of 1858, the amendatory and supplemental acts may be regarded as simply rendering its true meaning certain, and as in no way changing, adding to, or taking from it. They should not be declared void because of the insertion of the word "net," unless it is clearly repugnant to the sense in which the words "revenue from water rents" had been used in the original act.

But conceding that a change in the meaning and operation of the act has been worked, we think it is one the legislature might make without impairing the obligation of the contract.

As was said in *Meyer* v. *Brown,* "the tax was the chief security offered the creditors as an inducement to accept the bonds in payment of their claims." That fund is fixed, certain,—at least, to a minimum,—and can never be made less until the bonds are paid. (Sec. 34.)

The receipts to be derived from the other sources are

not fixed, but depend upon ordinance or statutory regu-
lation as to rates, and are subject to be discontinued at
any time.    The city authorities may—subject to legis-
lative control—fix water rates as they deem best, without
violating any vested right.    The city was not bound to
keep up the water-works for any time by any provision
in the act of 1858.    When the old works became worn
out and useless, the city was under no obligation to put
up new works.    But it is said in answer to this that the
city did build new works, and is receiving rents, and so
long as the rents are received, the city is bound to set
apart fifty-five per cent of the gross receipts.    This an-
swer would be sound if there were anything in the act
of 1858 requiring the city to fix any particular rates or
any provision fixing a minimum, as in the matter of
taxes.    The contract still exists, its obligations are still
as solemn and binding as they were under the act of
1858, and for aught appearing to the contrary, the
changes — if the new provisions can be regarded as
changing the original—not only have worked no injury
to the creditors, but have been a benefit to them as well
as to the inhabitants of the city.

The contract being one which by its nature—so far as
certain sources of revenue or receipts are concerned —
depends upon contingencies and expectancies, we think
it clear that the mode and manner of its performance is
within the control of the legislature.

There has been no attempt to repudiate.    On the con-
trary, the interests of both creditor and city have been
advanced.    In 1876 the net receipts exceeded the gross
receipts of 1863.    If new water-works had not been
erected, the revenue from this source would long since
have ceased entirely.    That the acts of the legislature
and of the city authorities have operated beneficially to
all interested is apparent, we think, from the second find-
ing of the court below, which is as follows:    "That the
water-works of the city of Sacramento which supplied

the inhabitants thereof with water at the time of the passage of the act of April 24, 1858, and at the time of the issuance of the bonds for city indebtedness provided for by said act, gradually became, by reason of decay and the growth of said city, insufficient to supply the necessary amount of water; and in 1872 the city of Sacramento, in pursuance of an act of the legislature of said state, entitled, 'An act to provide the city of Sacramento with a better supply of water,' which act was approved March 30, 1872, adopted the Holly system of waterworks, and purchased a new site and built thereon another building, and put in the necessary machinery of that system.

" By the old system for supplying water, the water was pumped from the Sacramento River into tanks or reservoirs, and from thence it flowed into the city mains or water-pipes by gravitation pressure.

" By the Holly system, the water was pumped from the Sacramento River and forced directly into the city mains by means of force-pumps used by said system. Two new and costly pumps were purchased for this purpose.

" By said Holly system, the pressure on the mains or pipes was greatly increased, and a new main pipe of increased strength was laid along I Street of said city for the purpose of conducting the water to the lesser pipes running throughout the city, and in use under the old system, and other new pipes were provided when necessary."

The petition shows that for the ten years including and next preceding the fiscal year 1872–73, the gross receipts from the water-works amounted to the sum of $417,891, and the net receipts $79,650; and for the ten years following, the gross receipts were $662,307, and the net receipts $258,664.

There is nothing in the decision in *Meyer* v. *Brown* opposed to the views herein expressed. That was a proceeding to compel the municipal authorities to levy a

tax of one hundred cents on the one hundred dollars, as required by the act of April 24, 1858. The petitioner alleged that said officers, "although requested by plaintiff to levy a tax of one hundred cents on the one hundred dollars, as required by said act passed April 24, 1858, have failed and refused to levy the tax for the year 1883, as required by said act, but have levied a diminished tax of fifty cents on one hundred dollars." The defendants denied that they were required to levy the tax claimed by petitioner, and averred "that the tax required to be levied by section 34 is not an annual or continuing tax, and that the same was levied in the year 1859, and the power to levy a further tax under said section is exhausted."

That was the issue, and the only issue, in that case, and what is said in the opinion must be considered as referring only to the question there determined.

SEARLS, C. J., concurred with Mr. Justice Paterson.

McFARLAND, J., dissenting.— I dissent from the conclusion of the majority of the court, and concur in the dissenting opinion of Mr. Justice Paterson.

It must be remembered that the water-works in question are conducted by the city of Sacramento *as a business*,—just like the business of any other water company, or of any mining, manufacturing, railroad, or mercantile company. In such a case the "revenue" is, of course, the excess of receipts over expenditures. If other financial miracles could be wrought as easily as the turning of the gross proceeds of a business into revenue, "then chapels had been churches, and poor men's cottages princes' palaces."