[No. C065522. Third Dist. Feb. 15, 2013.]

ALAMEDA COUNTY FLOOD CONTROL AND WATER
CONSERVATION DISTRICT et al., Plaintiffs and Appellants, v.
DEPARTMENT OF WATER RESOURCES, Defendant and Respondent;
ANTELOPE VALLEY-EAST KERN WATER AGENCY et al., Defendants,
Interveners and Appellants.

1164

## COUNSEL

Pillsbury Winthrop Shaw Pittman, John S. Poulos, Amy L. Pierce, Darcy L. Muilenburg; Lewis Brisbois Bisgaard & Smith, Greg L. Johnson; Kronick Moskovitz Tiedemann & Girard and Edward J. Tiedemann for Plaintiffs and Appellants Alameda County Flood Control & Water Conservation District Zone 7, Alameda County Water District, City of Yuba City, County of Butte, County of Kings, Empire West Side Irrigation District, Kern County Water Agency, Napa County Flood Control & Water Conservation District, Oak Flat Water District, Plumas County Flood Control & Water Conservation District, Santa Clara Valley Water District, Solano County Water Agency and Tulare Lake Basin Water Storage District.

Amelia T. Minaberrigarai for Plaintiff and Appellant Kern County Water Agency.

Bingham McCutchen, James J. Dragna, Colin C. West and Thomas S. Hixson for Defendants, Interveners and Appellants Antelope Valley-East Kern Water Agency, Castaic Lake Water Agency, Central Coast Water Authority, Coachella Valley Water District, Crestline-Lake Arrowhead Water Agency, Desert Water Agency, Littlerock Creek Irrigation District, Metropolitan Water District of Southern California, Mojave Water Agency, Palmdale Water District, San Bernardino Valley Municipal Water District, San Gabriel Valley Municipal Water District, San Gorgonio Pass Water Agency and United Water Conservation District.

Best Best & Krieger and Robert M. Sawyer for Defendant, Intervener and Appellant Ventura County Watershed Protection District.

Marcia L. Scully, John Schlotterbeck, Heather C. Beatty and Karen L. Tachiki for Defendant, Intervener and Appellant Metropolitan Water District of Southern California.

Kamala D. Harris, Attorney General, Denise Ferkich Hoffman, Matthew J. Goldman and Vera Sandronsky, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

**DUARTE, J.**—"As Mark Twain is said to have observed: 'Whiskey is for drinking; water is for fighting over.'" (*County of Imperial v. Superior Court*

(2007) 152 Cal.App.4th 13, 18 [61 Cal.Rptr.3d 145] (*Imperial*).) As lamented nearly 50 years ago, California's water is still maldistributed relative to supply and demand, and "California's North-South war still smoulders and is far from being resolved." (1 Rogers & Nichols, Water for Cal. (1967) California Water Plan, § 87, pp. 115–116 (Rogers & Nichols).)

The primary issue in this appeal after a court trial is whether the trial court properly interpreted the standard State Water Project (SWP) contract regarding how to credit water recipients (contractors) with the revenues from Oroville Dam hydropower (Oroville or Hyatt-Thermalito power). This power is now purchased by defendant Department of Water Resources (DWR) for use within the SWP, although some of it is then pooled with other SWP system power and traded or resold on the open market.

Generally speaking, plaintiffs are Northern California contractors who challenge DWR's methods, and interveners are Southern California contractors who defend the status quo.

The trial court found the contract was ambiguous as to whether the term "total revenues" as used in a key contract provision required valuing Oroville power at market rates as plaintiffs contend, but found the long course of dealings between the parties—a "practical construction" of the contract—refuted this construction. The trial court also found, as a matter of law, that the contract did not require DWR to treat profits from the so-called "resale" of system pool power towards that revenue. The trial court found these two interpretative conclusions resolved all issues. The judgment validates the status quo.

We agree with the trial court's ultimate interpretive resolutions, but do not entirely accept the trial court's reasoning. We hold the contract is *not* ambiguous on the subject of market rates, because its language—when read in light of governing law—is not reasonably susceptible of a reading that requires application of *current* market rates. In 1967, DWR signed a 50-year "Power Sale Contract," agreeing to sell power—evidently at then current market rates—to several utilities. Later, DWR took over that Power Sale Contract, in effect paying itself what the utilities had been paying to DWR. DWR was statutorily authorized to continue making to itself the payments that the utilities had previously made. The relevant statutes permitted DWR to do what it has been doing.

On the question of what plaintiffs generally refer to as "resales" of pooled system power, we conclude that DWR acted within its statutory authority in the manner in which it treated profits due to resales of Oroville power, and any arguable contractual ambiguity regarding this treatment is properly

resolved against plaintiffs by the practical construction rule, given a 20-year period of performance without challenge to DWR's administration of the contract.

We agree with the trial court that reaching these two ultimate interpretive conclusions vitiates plaintiffs' bad faith claim.

Accordingly, we shall affirm the judgment, and dismiss as moot a protective cross-appeal filed by interveners.

## BACKGROUND

California is the home of two huge, interrelated water projects. The federal Central Valley Project (CVP), including notably Shasta Dam, was built during the 1930's, and the SWP (including the tallest dam in the U.S., the Oroville Dam), was built during the 1960's. They exist for the following reason: "California's critical water problem is not a lack of water but uneven distribution of water resources. The state is endowed with flowing rivers, countless lakes and streams and abundant winter rains and snowfall. But while over 70 percent of the stream flow lies north of Sacramento, nearly 80 percent of the demand for water supplies originates in the southern regions of the state. And because of the semiarid climate, rainfall is at a seasonal low during the summer and fall when the demand for water is greatest; conversely, rainfall and runoff from the northern snowpacks occur in late winter and early spring when user demand is lower. [Citation.] Largely to remedy such seasonal and geographic maldistribution, while simultaneously providing relief from devastating floods and droughts, the California water projects were ultimately conceived and formed." (*United States v. State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 98–100 [227 Cal.Rptr. 161]; see *In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1153–1155 [77 Cal.Rptr.3d 578, 184 P.3d 709] (*Bay-Delta*).)

The SWP was initially authorized in 1951, and in 1960 the voters approved a then massive $1.75 billion general obligation bond measure to build "a complex system of reservoirs, dams, power plants, pumping plants, canals, and aqueducts" operated by DWR, to deliver water to "contractors" who "received entitlements to an annual amount of water in return for which they repay a proportionate share of the financing and maintenance of the SWP facilities." (*Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 898–899 [100 Cal.Rptr.2d 173] (*PCL*); see Wat. Code, §§ 12931, 12934, subd. (d), 12935.)[1] "The SWP serves the

---

[1] DWR was authorized to "enter into contracts for the sale, delivery or use of water or power . . . with public or private corporations, entities, or individuals." (Wat. Code, § 12937,

domestic water needs of approximately two-thirds of all Californians, with [the Metropolitan Water District of Southern California] receiving about half of the SWP's water delivery. [Citations.] Due to environmental concerns, however, construction of the entire SWP project has never been completed, resulting in the annual delivery of only about half of the 4.2 million acre-feet of water projected." (*Bay-Delta, supra,* 43 Cal.4th at p. 1155.)

The parties on appeal—apart from DWR—are SWP contractors, assignees or successor entities.[2]

Given the size of the SWP and the many conflicting economic, regional, and political interests, the contract details were hotly debated, and the trial court, in an understatement, found that the "respective positions and suggestions . . . were not harmonious."

On January 21, 1960, Governor Edmund G. "Pat" Brown issued "Contracting Principles for Water Service Contracts." Principle No. 4 partly stated most users would pay the actual cost of power to deliver water, large landholders would pay market value, and when power was "available for sale, it will be sold at its market value." "The difference between the actual cost and the market value" of power would yield a "power credit" to "reduce the cost of project water" except for large landholders.[3] The "cost of project water" was not defined.

---

subd. (b).) "All revenues derived from the sale, delivery or use of water or power" are deposited into accounts prioritized for specific purposes, with the first priority being maintenance and operation of SWP and the second being paying principal and interest on the bonds used to construct the project. (*Ibid.*)

Further undesignated statutory references are to the Water Code.

[2] Plaintiffs are the Alameda County Flood Control and Water Conservation District Zone 7, Alameda County Water District, City of Yuba City, County of Butte, County of Kings, Empire West Side Irrigation District, Kern County Water Agency, Napa County Flood Control and Water Conservation District, Oak Flat Water District, Plumas County Flood Control and Water Conservation District, Santa Clara Valley Water District, Solano County Water Agency, and the Tulare Lake Basin Water Storage District. Dudley Ridge Water District was a plaintiff at trial, but did not appeal.

Interveners are the Antelope Valley-East Kern Water Agency, Castaic Lake Water Agency, Central Coast Water Authority, Coachella Valley Water District, Crestline-Lake Arrowhead Water Agency, Desert Water Agency, Metropolitan Water District of Southern California (MWD), Mojave Water Agency, Palmdale Water District, San Bernardino Valley Municipal Water District, San Gabriel Valley Municipal Water District, San Gorgonio Pass Water Agency, and the United Water Conservation District. The Ventura County Watershed Protection District and Littlerock Creek Irrigation District were defendants and later treated as interveners, but only the former joined in the cross-appeal.

[3] The acreage definition for large landholders was modeled on the CVP definition, although that definition, relating to a limitation on CVP water delivery, had been controversial. (See *Ivanhoe Irr. Dist. v. All Parties* (1960) 53 Cal.2d 692, 705–716 [3 Cal.Rptr. 317, 350 P.2d 69]; 1 Rogers & Nichols, *supra,* Federal Participation, §§ 129–130, pp. 164–168; Hundley, The Great Thirst (rev. ed. 2001) pp. 251–272, 281, 285.)

The full text of principle No. 4 is found in footnote 22, *post.*

The statutes authorizing the SWP, popularly referred to as the Burns-Porter Act, were submitted to and passed by the voters at the November 8, 1960, General Election, as Proposition 1.[4] "After the contracting principles were published, but before the Act was approved by the voters, [DWR] entered into its first local water supply contract pursuant to the Act with MWD. The contract was negotiated on the basis of the contracting principles, and was contingent on the Act's later approval. Negotiations were of statewide significance because it was generally recognized that the contract would be the prototype for all later Project contracts, for article 45 of the MWD contract required that the basic terms and conditions of all later contracts be substantially uniform." (*Goodman v. County of Riverside* (1983) 140 Cal.App.3d 900, 905 [190 Cal.Rptr. 7] (*Goodman*).)

The parties agree the interpretation of the MWD contract applies to all the contracts.

Contractors must pay all SWP costs except recreation, fish and wildlife enhancement and flood control costs. Contractors pay both a "Delta Water Charge" and a "Transportation Charge." The Delta Water Charge is the water conservation facility capital, operation, maintenance, power and replacement (OMP&R) costs, and generally is paid whether or not a contractor takes water. The Transportation Charge is the transportation facility costs, including OMP&R costs, and is levied on delivered water. A major component of the Transportation Charge is the variable cost of power to pump and deliver water to each contractor.[5] Thus, credits to the Delta Water Charge benefit *all* contractors, but credits to the Transportation Charge benefit contractors as they receive water, and the farther their water travels, the more they benefit.

The Oroville Dam is the site of the Hyatt-Thermalito power complex, which annually produces 2.2 billion kilowatt hours of electricity. As characterized by our Supreme Court, "Power development is an essential part of the project, both to make it economically feasible and to provide the energy required for pumping in connection with the transportation of water." (*Metropolitan Water Dist. v. Marquardt* (1963) 59 Cal.2d 159, 173 [28 Cal.Rptr. 724, 379 P.2d 28] (*Marquardt*).)[6]

---

[4] The official title of the Burns-Porter Act is the California Water Resources Development Bond Act. (§ 12930 et seq.; see *Warne v. Harkness* (1963) 60 Cal.2d 579, 582, fn. 3 [35 Cal.Rptr. 601, 387 P.2d 377] (*Warne*).)

[5] Plaintiffs County of Butte, City of Yuba City, and Plumas County Flood Control and Water Conservation District do not pay the Transportation Charge due to their proximity to the Oroville Dam.

[6] The Thermalito Pumping-Generating Plant was recently renamed in honor of Ronald B. Robie, now an associate justice of this court. Many documents he authored in his prior capacity as DWR Director were admitted into evidence at trial. He did not participate in this appeal.

*Annually*, the SWP consumes more power than it generates. But its powerplants can operate at all hours, allowing DWR to exploit the variable price of electricity: DWR can run water pumping plants at "off-peak" times (generally at night and on weekends), when the cost of electricity is lower, and sell or trade on the open market power it produces at "on-peak" times, when the value of electricity is higher, netting a profit to reduce SWP's costs.

As briefly discussed *ante*, the contracting principles *contemplated* that power would be sold at market rates. However, on this and many other points the Legislature was divided. The trial court found that "As negotiations progressed, the concept of a market-based valuation of power was ultimately deleted from the contract." In May through July 1960, DWR and MWD exchanged proposed contract terms contemplating crediting power at market rates. But no such provision ultimately was adopted.

Instead, article 22(a) of the MWD contract (all further references to articles are to the MWD contract) as finally agreed upon by the parties reads in relevant part as follows: "The payments to be made by each contractor for project water shall include an annual charge designated as the Delta Water Charge. This charge, together with the total revenues derived during the project repayment period from the sale or other disposal of electrical energy generated in connection with operation of project conservation facilities, shall return to the State during the project repayment period all costs of the project conservation facilities including capital, [OMP&R], which are allocated to the purpose of water conservation in, above, and below the Delta pursuant to subdivision (e) of this article."[7]

The Legislature had the power to change the MWD contract during the 1961 Regular Session; if it chose to do so, MWD had the choice whether to accept the changes. But the Legislature did not make any changes, thereby indicating its approval of the contract. (See *Marquardt, supra*, 59 Cal.2d at pp. 181–182, 202.) The People also approved the contract. As correctly summarized by a relevant Attorney General opinion: "When the people of the state approved the Burns-Porter Act, they enacted into law a unified system of financing the water system, including authorization for both initial financing (the bonds) and payment of long-term debt and operational costs (the water contracts). The bonds, the mandate to enter into contracts, and the pledge of proceeds are part of the single and indivisible scheme the voters accepted.

---

[7] Article 22(a) is worded slightly differently in later contracts, but no party argues the difference is material.

Article 22(c) sets out an algebraic formula for calculating the variable components of the Delta Water Charge and categories of cost allocation. DWR's February 10, 1961, contract analysis, admitted as a trial exhibit and mentioned at oral argument, explains that costs were to be recovered over the entire project repayment period, and the article 22(c) formula was designed to reduce such costs to "present worth."

The largest contract, the [MWD] contract, was signed four days prior to the voter approval of the Burns-Porter Act, and the California Supreme Court has held that the voters were aware of the contract when they approved the Burns-Porter Act. . . . *In sum, the voters did not simply approve the $1.75 billion bond indebtedness; they also approved a contractual scheme to support the system and pay the indebtedness.*" (61 Ops.Cal.Atty.Gen. 373, 379 (1978), citation omitted, italics added.)

Thirty water supply contracts were signed between 1960 and 1963, and each contained similar terms, consistent with the MWD contract's uniformity provision.

Under article 1(w), the "project repayment period" extends "until all bonds secured by the pledge of revenues provided for by the Bond Act have been repaid." Proposition 1 authorized $1.75 billion in Burns-Porter Act *general obligation bonds*, to fund construction of the Oroville Dam and other facilities. (§ 12934; see *PCL, supra*, 83 Cal.App.4th at pp. 898–899.) Article 5 provides that the contract was entered into "for the direct benefit" of holders of those bonds, "and . . . the income and revenues derived from [this] contract[]" were pledged according to a statutory hierarchy. (§ 12937, subd. (b).) The Hyatt-Thermalito powerplants were built with CVP *revenue bonds*. (See 15 McQuillin, Law of Municipal Corporations (3d ed. 2005) Municipal Bonds, § 43:10, pp. 654–655 [distinguishing the two kinds of bonds].)

Under a 1966 "Suppliers Contract," utilities sold power to the SWP at a fixed price, paid for by way of the "variable" component of the Transportation Charge paid by the contractors, which is essentially the net cost of SWP's power.[8]

Under a November 29, 1967, Power Sale Contract, the utilities (other than LADWP) agreed to buy all Oroville power from the SWP for 50 years, or until the Hyatt-Thermalito construction revenue bonds were repaid, whichever was later. The utilities paid $16.15 million annually, based on an estimated annual generation of 2.1 billion kilowatt hours.[9] Of that annual

---

[8] These utilities were Pacific Gas and Electric Company, Southern California Edison, San Diego Gas & Electric Company, and the Los Angeles Department of Water and Power (LADWP).

[9] To address power production fluctuations, a clearing account was created, into which the utilities paid for excess power and DWR paid for shortages. When the Power Sale Contract was terminated in 1983, the Delta Water Charge was credited with the account balance. A similar account existed until the Hyatt-Thermalito construction revenue bonds were paid off in 1994.

The trial court found that in negotiating the Power Sale Contract, DWR obtained the best deal it could. This arguably equates to fair market value, or "the price which a willing buyer

payment, $14.65 million was applied to principal and interest on the construction revenue bonds, and the remaining $1.5 million was a fixed amount applied to OMP&R costs. However, those costs eventually exceeded $1.5 million. The trial court found DWR "treated the $16.15 million a year received under the Power Sale Contract as the 'total revenues' generated by Hyatt-Thermalito under Article 22 in calculating the Delta Water Charge thereunder. There was no evidence of any objection to this interpretation . . . ."

The parties stipulated that "The energy crisis of 1973 caused power prices to increase to unanticipated levels." As anticipated, the utilities gave five years of notice that they were cancelling the 1966 Suppliers Contract, effective April 1, 1983. This meant, as the trial court put it, that if DWR "did nothing, after 1983 it would be selling Hyatt-Thermalito power to the utilities at a relatively low price, and likely buying power from them at significantly higher prices." However, as the trial court found, the Power Sale Contract allowed DWR to terminate it with five years of notice and "in essence step[] into the shoes of the utilities," by buying the same SWP power it had been selling to the utilities. (See §§ 11670, 11671.) DWR's outside bond counsel (now known as Orrick, Herrington & Sutcliffe) opined DWR would act "on both sides of the transaction," or "in effect contract with itself for the sale and use of Oroville Power."

But there was disagreement about what DWR should do. An "Ad Hoc Energy Committee" was created in 1976; it conducted many meetings with contractors and received many letters from them. The trial court summarized the discussions as follows:

"Whether to withdraw Hyatt-Thermalito power had substantial implications for the contractors, since DWR passed on all power costs incurred for pumping water to them. [Citation.] Withdrawal of that power also raised the issue central to the current dispute regarding how to value the power for purposes of crediting the Delta Water Charge. DWR convened the Ad Hoc Energy Committee for the purposes of addressing these issues, and sent a notice to the contractors inviting them to participate in the Committee's meetings. [Citations.] The Ad Hoc Energy Committee met many times over the next few years.

would pay to a willing seller, neither being under compulsion to buy or sell, and both having full knowledge of all pertinent facts." (*Estate of Rowell* (1955) 132 Cal.App.2d 421, 429 [282 P.2d 163].) In a trial exhibit, former Governor Ronald Reagan characterized the Power Sale Contract as " 'highly satisfactory to the State.' " DWR suggests it did *not* obtain market price, but DWR does not challenge the finding it obtained the best possible 50-year price. It appears DWR merely means the rate did not vary with what it calls "evolving" market prices, and what plaintiffs call "short-term prices for spot sales."

"A key issue addressed in the committee meetings and related correspondence was how to value Hyatt-Thermalito power for purposes of crediting the Delta Water Charge. . . . As to the value of Hyatt-Thermalito power, DWR enumerated four potential alternatives:

"Alternative A—The status quo, meaning that DWR would not cancel the Power Sale Contract and would continue to sell power at a fixed amount to the utilities, yet buy power at what was reasonably anticipated to be a significantly increased market rate.

"Alternative B—DWR would sell Hyatt-Thermalito power at market to the utilities under a renegotiated Power Sale Contract and buy power back from the utilities at the increasing market rate.

"Alternative C—DWR would cancel the Power Sale Contract, buy Hyatt-Thermalito power for the benefit of the SWP, and, for purposes of the credit to the Delta Water Charge, value that power at DWR's assigned amount ($14.65 million plus actual [OMP&R] costs).

"Alternative D—DWR would cancel the Power Sale Contract, buy Hyatt-Thermalito power for the benefit of the SWP, and, for purposes of the credit to the Delta Water Charge, value that power at market rate (then estimated at $50 million)."

Alternatives A and B were quickly rejected. Then, the Tehachapi Mountains reared up into the discussions. Although some water is sent to the South Bay Aqueduct, and then west to the Santa Clara Valley, most of it is "lifted into the California Aqueduct . . . and eventually again lifted by a series of pumping stations over the Tehachapi Mountains for delivery and use in the Southern California region." (*United States v. State Water Resources Control Bd., supra*, 182 Cal.App.3d at p. 100.) The difference in transportation cost is huge. It takes more electrical power to pump water to the west, to service the Central Coast contractors, or to the south, to cross the Tehachapi Mountains and service Southern California contractors, than it takes to pump water to contractors closer to the Oroville Dam. Some interveners are west of the California Aqueduct, but most are south of the Tehachapis; plaintiffs are farther north and therefore have lower power costs for the water delivered to them.[10]

As the trial court found:

---

[10] For example, in 1978, the acre-foot cost was below $15 in the Sacramento Delta, but over $100 beyond the Tehachapis. (See 61 Ops.Cal.Atty.Gen., *supra*, at p. 376.) Some power is recaptured by "recovery plants" as water falls downhill, and downstream contractors receive a credit for that recaptured power, as provided by article 26.

"Thus Alternative D would benefit contractors with relatively low pumping costs, since it would substantially lower the Delta Water Charge which would receive a credit based upon the full market value of the power generated and consumed in the SWP. Alternative D would at the same time disadvantage contractors with high pumping costs, since a market value credit to the Delta Water Charge would mean that those contractors would pay market value for Hyatt-Thermalito power through the Transportation Charge thereby dramatically increasing the cost of water to them.

"Alternative C would have the opposite effect; it would benefit contractors with high pumping costs, to the detriment of those with low pumping costs."

The trial court found DWR favored Alternative C for two perceived reasons, both of which concerned potential downsides to implementation of Alternative D. First, Alternative D could create a power credit so large that "contractors would pay nothing, or would be paid, to take water." Second, Alternative D could cause cashflow problems, because Oroville power revenue first went towards paying off construction bonds, and although Alternative D would pay off those bonds more quickly, DWR would have less available money in the meantime.

On September 30, 1977, DWR cancelled the Power Sale Contract, effective April 1, 1983. It was replaced by the "Fourth Supplemental Resolution," which became the "State Power Contract." In October 1978, DWR adopted a power valuation formula, set forth in its "Bulletin 132-78," incorporating Alternative C. DWR has consistently applied that formula since it terminated the Power Sale Contract. The Hyatt-Thermalito CVP revenue bonds were retired in 1994; since then, the State Power Contract has been set forth in "Project Order No. 36."

Under Project Order No. 36, DWR credits the Delta Water Charge with the same $14.65 million the utilities paid under the 50-year 1967 Power Sale Contract, but pays *actual* OMP&R costs—which plaintiffs concede are more than the fixed amount the utilities paid. Project Order No. 36 expires November 29, 2017, when the Power Sale Contract would have expired, had it not been cancelled.

In December 2003—20 years after Alternative C was implemented— plaintiff Kern County Water Agency (KCWA) (referred to as the "lead" and "largest" plaintiff)—claimed all revenue from sales or "allocable" transfers of Oroville power *must be* credited to the Delta Water Charge at current market rates.

Plaintiffs filed their initial complaint on April 25, 2005. After pretrial skirmishes, two cases were consolidated for court trial. Over plaintiffs' objection, the trial court bifurcated liability and damages.

After a lengthy court trial and extensive briefing, the trial court issued a statement of decision finding against plaintiffs on the issue of contract interpretation. The trial court concluded the phrase "total revenues" in article 22(a) was ambiguous as to whether it meant market rates whether the power was used by DWR or resold for a profit, but concluded that the long course of dealings between the parties showed the contract did not require valuing power at market rates in either case.

On October 30, 2009, over plaintiffs' objection, the trial court issued what it styled as an "interlocutory judgment" incorporating its interpretation of the contract. This document declares as follows:

"1. Article 22(a) of the Water Supply Contracts does not mandate that the full market value of all power generated by project conservation facilities must be reflected in a credit to the Delta Water Charge, regardless of whether the power is sold outside of, or consumed within, the [SWP], or is sold for less than market value; and,

"2. [DWR's] subsequent resale of power generated by project conservation facilities, after purchasing that power under the State Power Contract, does not constitute a sale or other disposal of power under Article 22(a), so revenue from that resale is not an additional offset to the Delta Water Charge."

On May 3, 2010, the trial court granted judgment on the pleadings in favor of interveners and DWR, finding its interim ruling resolved all remaining issues.

Plaintiffs (except for Dudley Ridge Water District) timely filed this appeal after the trial court denied their motion for a new trial. Interveners (except for Littlerock Creek Irrigation District) filed a protective cross-appeal.

## DISCUSSION

As we shall explain in parts I and II, although we disagree with a portion of the trial court's reasoning, we uphold the trial court's conclusion that plaintiffs have not demonstrated that DWR has breached the contract. In part III, we uphold the trial court's finding that resolution of the contract interpretation questions undermines plaintiffs' bad faith claim. In part IV, we conclude that interveners' cross-appeal is moot.

# I

## *The Market Rate Claim*

The parties agree the contract is unambiguous regarding application of market rates; however, plaintiffs claim it unambiguously means DWR *must* credit the Delta Water Charge with the market rate value of power, while DWR and interveners claim the contract unambiguously *precludes* this interpretation. We agree with DWR and interveners.

After setting forth general rules regarding ambiguity in part IA., we shall explain in part IB. why the contract does not require DWR to credit the Delta Water Charge with the market value of Oroville power. Then we shall discuss and reject arguments raised by plaintiffs in their effort to show the contrary, or at least to raise an ambiguity: In part IC., we reject claims based on a contractual provision applicable to large landholders. In part ID., we reject claims based on dictionary definitions. In part IE., we reject claims based on extrinsic documents. In part IF., we summarize our conclusions.

### A. *General Rules of Ambiguity*

■ We have said that "indeterminancy in the *application* of language signals its vagueness or ambiguity. An ambiguity arises when language is reasonably susceptible of more than one application to material facts. There cannot be an ambiguity per se, i.e. an ambiguity unrelated to an application." (*California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1986) 177 Cal.App.3d 855, 859, fn. 1 [223 Cal.Rptr. 246], italics added.)

■ Thus, an ambiguity cannot be created by parsing words outside their context. (See *Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 868 [77 Cal.Rptr.2d 107, 959 P.2d 265].) " '[L]*anguage in a contract* must be construed in the context of that instrument as a whole, and in the circumstances of that case, and *cannot be found to be ambiguous in the abstract.*' " (*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 867 [21 Cal.Rptr.2d 691, 855 P.2d 1263] (*Bay Cities*).) "Multiple or broad meanings do not necessarily create ambiguity. . . . [¶] The proper question is whether the word is ambiguous in the . . . circumstances of *this* case." (*Bay Cities, supra,* 5 Cal.4th at p. 868.) Nor does the fact that language *could be* clearer make it ambiguous. (See *Banning Ranch Conservancy v. Superior Court* (2011) 193 Cal.App.4th 903, 914 [123 Cal.Rptr.3d 348]; *Suarez v. Life Ins. Co. of North America* (1988) 206 Cal.App.3d 1396, 1406 [254 Cal.Rptr. 377].) Instead: "To say that language is ambiguous is to say there is more than one semantically permissible candidate for application, though it cannot be determined from the language which

is meant. Every substantial claim of ambiguity must tender a candidate reading of the language which is of aid to the claimant. One must ask what meanings are proffered and examine their plausibility in light of the language. A party attacking a meaning succeeds only if the attacker can propose an alternative, plausible, candidate of meaning." (*Estate of Dye* (2001) 92 Cal.App.4th 966, 976 [112 Cal.Rptr.2d 362] (*Dye*).)

Importantly, "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." (Civ. Code, § 1638.) "Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists." (*Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764] (*Reserve Insurance*).) "In the construction of a statute or instrument, the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all." (Code Civ. Proc., § 1858; see Civ. Code, § 1641 ["[t]he whole of a contract is to be taken together . . ."].)

 "An ambiguity can be patent, arising from the face of the writing, or latent, based on extrinsic evidence." (*Solis v. Kirkwood Resort Co.* (2001) 94 Cal.App.4th 354, 360 [114 Cal.Rptr.2d 265].) "A claim of latent ambiguity requires a provisional examination of extrinsic matters to make the judgment whether the claim is tenable." (*City of Sacramento v. Public Employees' Retirement System* (1994) 22 Cal.App.4th 786, 795 [27 Cal.Rptr.2d 545]; see *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165–1166 [6 Cal.Rptr.2d 554] (*Winet*).)

*If* extrinsic evidence factually conflicts, the trial court's resolution of that conflict is reviewed for substantial evidence, otherwise the trial court's ultimate interpretation of the contract is reviewed de novo. (See *Winet, supra*, 4 Cal.App.4th at pp. 1165–1166.)

B. *The Contractual Language and Governing Law*

As we have set forth *ante*, article 22(a) refers to "total revenues" as follows: "The payments to be made by each contractor for project water shall include an annual charge designated as the Delta Water Charge. This charge, together with the total revenues derived during the project repayment period from the sale or other disposal of electrical energy generated in connection with operation of project conservation facilities, shall return to the State during the project repayment period all costs of the project conservation

facilities including capital, [OMP&R], which are allocated to the purpose of water conservation in, above, and below the Delta pursuant to subdivision (e) of this article."

Therefore, "total revenues derived . . . from the sale or other disposal of" Oroville power lower the Delta Water Charge, which, when added to those "total revenues" must equal—that is, "return to the State during the project repayment period"—"all costs of the project conservation facilities" allocated to "water conservation in, above, and below the Delta." As stated by the 1961 DWR contract analysis mentioned earlier (fn. 7, *ante*), "the Delta Water Charge repays only those conservation costs, including power costs, which are not repaid by power revenues." Larger "total revenues" lower the Delta Water Charge and smaller "total revenues" raise it.[11]

We see nothing in article 22(a) that even *hints* that the "total revenues" bear any necessary relationship to market rates of electricity, rates which constantly fluctuate for reasons wholly external to the contract and to project costs.

 Further, "As a general rule, ' "all applicable laws in existence when an agreement is made, which laws the parties are presumed to know and to have had in mind, necessarily enter into the contract and form a part of it, without any stipulation to that effect, as if they were expressly referred to and incorporated." ' " (*Swenson v. File* (1970) 3 Cal.3d 389, 393 [90 Cal.Rptr. 580, 475 P.2d 852]; see 11 Williston on Contracts (4th ed. 2012) Interpretation and Construction § 30:19, p. 247 [applied to public contracts].)

The trial court found that statutes granting DWR discretion to set power rates were useful to resolve contractual ambiguity. But a key point—ignored by plaintiffs—is that those statutes were *part of the contract*: Indeed, the *first paragraph* of the contract stated it was entered into "pursuant to the provisions of the [Burns-Porter] Act, the [CVP] Act, and other applicable laws."

One CVP statute provides DWR "shall have full charge and control of the construction, operation, and maintenance of the project and the collection of all rates, charges, and revenues from it." (§ 11451.) Another CVP statute provides:

"Under such regulations and upon such terms, limitations, and conditions as it prescribes, [DWR] may do any of the following:

---

[11] Under article 1(v), "Project Revenues" means "revenues derived from the service of project water to contractors and others, and from the sale or other disposal of electrical energy generated in connection with operation of project facilities." This definition does not apply to the issues in this case.

"(a) Fix and establish the prices, rates, and charges at which the resources and facilities made available by the project shall be sold and disposed of.

"(b)(1) Enter into contracts and agreements and do any and all things which in its judgment are necessary, convenient, or expedient for the accomplishment of the purposes and objects of this part." (§ 11454; see Stats. 1957, ch. 1932, § 293, p. 3410.)[12]

A CVP limitation on DWR's discretion provides: "The department shall enter into such contracts and fix and establish such prices, rates, and charges so as at all times to provide revenue which will afford sufficient funds to pay all costs of operation and maintenance of the works authorized by this part, together with necessary repairs and replacements thereto, and which will provide at all times sufficient funds for redemption of all bonds and payment of interest thereon, as and when such costs and charges become due and payable." (§ 11455.)

Thus the CVP statutes, *explicitly* incorporated into the contract, permit DWR to set power rates, provided the rates are sufficient to operate the system and protect bondholders.

██ Further, the statutes authorizing cancellation of the Power Sale Contract required DWR to find that "notwithstanding the cancellation, it will receive and be paid a total revenue or consideration at least equal to that which would be received by it were the contract . . . not canceled, and within the unexpired portion of the term of the contract . . . ." (§ 11671.) By statute, DWR had to pay for the power "at a rate or price at least equal to that specified in the contract or lease to be canceled and for a period at least equal to the unexpired portion of the term of such contract or lease." (§ 11670.) These statutes predated the contract (Stats. 1957, ch. 1932, §§ 336–337, p. 3417); consequently, they were part of the contract.

These statutes did *not* require DWR to pay market rates for power upon cancellation of the Power Sale Contract, but merely required DWR to pay as much as had been paid before, or, as the trial court characterized it, to "step[] into the shoes of the utilities," when DWR bought the power.[13]

---

[12] A subsequent amendment to the quoted statute is of no relevance herein. (See Stats. 1997, ch. 566, § 1, p. 3436.)

[13] We add two caveats to the trial court's metaphor. First, the utilities paid a fixed OMP&R amount, but DWR pays *actual* OMP&R costs, which are higher. Second, DWR owes contractual duties to plaintiffs as set forth in the water supply contracts, whereas its duties to the utilities were defined by the Power Sale Contract.

Thus, the contract, read in light of governing statutes explicitly incorporated therein, gave DWR the discretion to pay at least the same amount for power that the utilities were paying, and did not require it to pay market rates.

Plaintiffs repeatedly assert the California Supreme Court has held that DWR's calculation of the Delta Water Charge " 'do[es] not involve opinion or discretion.' " We disagree.

Our Supreme Court addressed a claim that the payment provisions of the contract were too uncertain to be enforceable: "It is contended that some of these allocations, provided for in article 22(e), require the evaluation of imponderables on a subjective basis (i.e., involving personal opinion and discretion) and that the contract does not provide who shall make the subjective evaluations." (*Marquardt, supra*, 59 Cal.2d at p. 195.) In part, the court stated: "*Several other provisions of the contract leave to the state determinations with respect to the water charges which involve subjective opinion and discretion*, and no provision of the contract leaves any comparable determination to others than the state. The contract considered as a whole leaves no doubt that the allocations must be made by the state." (*Marquardt, supra*, at p. 196, italics added, fn. omitted.) The omitted footnote states: "See, e.g., articles 22 and 23 which contain provisions showing that the state shall determine which costs of project facilities are reimbursable by the contractors, and articles 24(b)(3) and 25(b) which provide that the state shall make the allocation of the 'transportation charge' among the contractors." (*Id.* at fn. 17.)[14] Accordingly, read in context, *Marquardt rejected* the contention that DWR has no discretion pursuant to article 22.

Thus, we see nothing in article 22(a), either on its face or as it has been interpreted by our Supreme Court, to require the application of market rates.

C. *Article 30*

Plaintiffs contend a "surcharge" for large landholders provided by *article 30* shows that the phrase "total revenues derived" as used in *article 22* must refer to or at least plausibly can be read to refer to market rates. We are not persuaded.

---

[14] We also note that article 22(c), setting forth the computational details of ascertaining the Delta Water Charge after an interim $3.50-per-acre-foot rate, refers to revenues "allocated by the State" to various costs.

In their supplemental brief, plaintiffs quote a snippet of MWD's brief in the *Marquardt* case, asserting MWD therein conceded market rates were required. MWD's *Marquardt* brief, read in context, does not concede that point, but refers to "revenues derived" from project conservation facilities. Nor would the views of one contractor bind DWR or any other contractors.

The acreage definition we referenced at footnote 3, *ante*, levied a "surcharge" on large landholders as described in article 30(a), consisting of "an amount equivalent to the power credit per acre-foot of water" used on so-called "excess" land. Under article 30(b), "the term 'power credit' shall mean *the net value accruing to the State* from revenues derived from the sale or other disposal of electrical energy generated . . . after deducting from said revenues the amount necessary to repay the investment properly chargeable to energy generation and for operation, maintenance, and replacement of the electrical generation facilities." (Italics added.) A fixed $2-per-acre-foot surcharge applied until the powerplants were operational; thereafter, it was recomputed annually pursuant to a given formula.

We shall assume for the sake of argument that the "net value" referenced in article 30(b) equates to the "market value" for power, less costs. However, as DWR correctly points out, although article 30 required payment of a surcharge by large landholders, who were *customers* of water contractors, the contractors themselves "continued to pay for their respective allocations of project water through the Delta Water Charge (Article 22) and the Transportation Charge (Article 26)." *Other* parts of article 30 required contractors to ascertain which customers were subject to the surcharge, then collect and forward receipts to DWR. But the fact that some of their customers (i.e., large landholders) may have paid a surcharge based on the market value of power under article 30 does not change the language of article 22(a), defining the Delta Water Charge paid by contractors.

Plaintiffs again seek support in *Marquardt, supra,* 59 Cal.2d 159. In that case, our Supreme Court upheld article 30's surcharge against claims it was unlawfully discriminatory.[15] (*Marquardt, supra,* 59 Cal.2d at pp. 186–188.) In discussing *that* issue, *Marquardt* observed: "The state provides the project water at cost but *sells project power at market value* and uses the power revenues to reduce the cost of water, thus granting water users a subsidy. The surcharge is calculated on the basis of the power profits used to subsidize water users and has the effect of limiting the amount of the subsidy received by persons who have large land holdings, a circumstance which tends to indicate that they are less in need of subsidy." (*Marquardt, supra,* 59 Cal.2d at p. 186, italics added.)

■ Plaintiffs rely on the Supreme Court's reference to selling power at market value. But the Supreme Court was describing how the contract worked generally, and did not purport to explicate article 22(a)'s meaning as pertinent to this case. "A decision is not even authority except upon the point

---

[15] The contract included a prophylactic severability provision, article 30(i), apparently because a formal legal opinion by Brobeck, Phleger & Harrison had concluded that the surcharge was unlawfully discriminatory.

actually passed upon by the Court and directly involved in the case." (*Hart v. Burnett* (1860) 15 Cal. 530, 598; see *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 88 [87 Cal.Rptr.2d 754] (*Paterno*).) And because *Marquardt* was decided in 1963, before the 1967 Power Sale Contract, at best for plaintiffs it reflected what DWR *hoped* to receive, not what its "total revenues" actually would be.[16]

Plaintiffs also point to a January 21, 1960, press conference, wherein DWR officials discussed the contracting principles, and used a hypothetical to illustrate article 30, to show small landholders would pay the actual cost of power, but large landholders would pay the market value, by means of a power credit to the small landholders. Plaintiffs reason that article 30 took away this *market value* power credit from large landholders. However, as we mentioned in the Background, *ante*, and later discuss in part IE.1., *post*, principle No. 4's call for calculating the Delta Water Charge using market rates was dropped during the contract negotiations.

Plaintiffs also point to the 1961 DWR contract analysis we referred to earlier (fn. 7, *ante*), which states in part: "The power credit per acre-foot is the amount of the net value of electrical energy generated . . . at Oroville Dam . . . . It will be recalled that power cost and revenues are taken into account in the computation of the Delta Water Charge, and that each contractor thereby receives a proportionate share of the benefit of net power revenues or 'power credit'. By making the power credit per acre-foot the measure of the surcharge to be levied under this article, the contract in effect recovers from certain water users a portion of the power credit accorded them under the Delta Water charge."

This discussion of *article 30* does not raise any ambiguity regarding *article 22(a)*. Like the passage in *Marquardt* relied on by plaintiffs discussed immediately above, this passage did not address whether "total revenues derived" must equate to market value; it described how the surcharge would be calculated. That same summary explained that "the Delta Water Charge repays only those conservation costs, including power costs, *which are not repaid by power revenues*." (Italics added.) Thus, the summary, taken as a whole, accurately reflected the difference between "revenues" and "net value" articulated by the contract.

---

[16] At oral argument, plaintiffs asserted "before substantial pumping began," an MWD audit caused DWR to revise credits to the Delta Water Charge to market value. We find no references to such an audit in plaintiffs' briefing, and we decline to forage through what the parties concede is a massive record to see if such an audit is there. (See *Paterno, supra*, 74 Cal.App.4th at p. 76.) Plaintiffs do cite to DWR bulletin No. 132-64, issued in June 1964, which refers to use of "the market value of the power" in setting the Delta Water Charge. But that passage was merely making the point that *the use of revenue bonds* did not have any effect on the Delta Water Charge.

 Further, the very fact the parties used "net value" in one part of the contract (art. 30(b)) and "total revenues derived" in another (art. 22(a)) shows the two sections reference different concepts. As a general rule of *statutory* interpretation, " 'Where the same word or phrase might have been used in the same connection in different portions of a statute but a different word or phrase having different meaning is used instead, the construction employing that different meaning is to be favored.' " (*People v. Stewart* (2004) 119 Cal.App.4th 163, 171 [14 Cal.Rptr.3d 353].) We apply this rule to the contract in this case, which by virtue of the manner of its confirmation by the people and the Legislature is akin to a statute. (See 61 Ops.Cal.Atty.Gen., *supra*, at p. 379.) Further, a similar rule obtains in contract cases: "[I]t must be held, in the absence of any expression in the contract to the contrary, that words which are not synonymous were never intended to be so used." (*Cordes v. Harding* (1915) 27 Cal.App. 474, 480 [150 P. 650]; see 14A Cal.Jur.3d (2008) Contracts, § 222, p. 54.)

Having rejected use of the term "market rate" in favor of "total revenues derived" in the final version of article 22(a), and then using "net value" in article 30(b), the parties clearly signaled a different meaning. The fact that some water *customers* were required to pay a surcharge based on the market value of power does not mean the Delta Water Charge paid by water *contractors* was also based on market value.

Plaintiffs also argue, "if power used for pumping were valued at its generating cost (the bond service plus operating and maintenance costs) rather than market, as Respondents contend, and the costs were then deducted, the resulting 'surcharge' would have been zero, making Article 30 meaningless." DWR appears to concede the surcharge was zero. However, the appellate record shows it was not zero, it was just much smaller than had been expected.[17] In any event, we see nothing in article 30(b)'s use of the term "net value" that raises any ambiguity in article 22(a)'s use of the term "total revenues derived."[18]

---

[17] Indeed, the cost of ascertaining those customers subject to the surcharge proved so high, and the revenue derived therefrom so low, that the parties deleted article 30 from the contracts in 1972.

In its briefing regarding the article 30 surcharge, and at oral argument, plaintiffs suggested that because article 26, defining the Transportation Charge, provides an explicit credit for recovery power, it somehow *precludes* the result from Alternative C, namely, reducing the Transportation Charge for Southern California contractors. This oblique point was not separately headed and lacks coherent analysis, therefore we decline to address it. (See *People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2 [34 Cal.Rptr.2d 558, 882 P.2d 249]; *Loranger v. Jones* (2010) 184 Cal.App.4th 847, 858, fn. 9 [109 Cal.Rptr.3d 120] (*Loranger*).)

[18] Plaintiffs also point to the initial $3.50-per-acre-foot Delta Water Charge rate provided by article 22(b), which remained consistent as draft contract language changed, claim this

### D. *Dictionary Definitions*

Plaintiffs contend dictionary definitions of "revenue" and related words import market rates into the contract "under the ordinary meaning of words" as follows: "Under Article 22(a), DWR must offset the Delta Water Charge with the 'total revenues derived . . . from the sale or other disposal of electrical energy generated in connection with operation of project conservation facilities.' Under the ordinary meaning of words, this requires the Delta Water Charge to be reduced by an amount that captures the true value of all money or other consideration received by DWR ('total revenues') from the disposition of [Hyatt-Thermalito] power. See, e.g., Black's Law Dictionary 1433 (9th ed. 2009) ('revenue' means '[g]ross income or receipts'); Black's Law Dictionary 703 (6th ed. 1990) ('gross receipts' means '[t]he total amount of money or the value of other considerations received') (emphasis added). 'Revenue' is '[t]hat which returns, or comes back, from an investment; the annual or periodical rents, profits, interest, or issues of any species of property, real or personal . . . .' Webster's Unabridged New International Dictionary of the English Language (2d ed. 1934) (emphasis added); see also Compact Edition of the Oxford English Dictionary 597 (1985) ('revenue' is '[t]hat which comes in to one as a return from property or possessions . . .')."

Far from advancing plaintiffs' cause, these definitions stand for the unremarkable point that "revenue" means that which is gained or received back, such as interest on an investment, a meaning *at odds with* the "market rate" claim.

One *arguable* exception is a definition from a superseded edition of Black's Law Dictionary, defining "gross receipts" to mean "[t]he total amount of money *or* [the value of] other" consideration received. (Black's Law Dict., *supra*, p. 703, italics added.) But this definition does not mean that revenues that are received in money can *also* be deemed to have some *additional* value. Further, the *current* edition defines "gross receipts" as the "total money or other consideration" received. (Black's Law Dict., *supra*, p. 772; see Black's Law Dict. (7th ed. 1999) p. 710.) The prior definition was short lived because it stemmed from a sister state's tax statute, and therefore was a peculiar definition, not a common definition. (See *New Mexico Enterprises v. Bureau of Revenue* (Ct.App. 1974) 86 N.M. 799 [528 P.2d 212, 213]; N.M. Stat. Ann. § 7-9-3.5(A)(1) [" 'gross receipts' means the total amount of money or the value of other consideration received . . ."], former § 72-16A-3(F).)

---

reflected market value, and argue it shows market value was consistently anticipated throughout contract negotiations. But the $3.50 rate lasted only through December 31, 1969, the approximate date when water deliveries were expected to begin. Thus, although some evidence supports plaintiffs' claim that it was derived from market value, this rate was merely an interim provision that postponed the date when the calculations of the charges pursuant to the algebraic formula set forth in article 22(c) would commence.

Finally, relevant definitions would be from sources *predating* the contract. (See *Taniguchi v. Kan Pacific Saipan, Ltd.* (2012) 566 U.S. ___, ___–___ [182 L.Ed.2d 903, 912–913, 132 S.Ct. 1997].) Such definitions refute plaintiffs' contention. (See Ballentine's Law Dict. (2d ed. 1948) p. 1139 ["Revenue or income is what is produced by capital" and equates to "Income or annual profit received" or "that which returns, or comes back from an investment"]; 2 New Century Dict. (2d ed. 1936) p. 1546 ["return or yield from any kind of property"].) And before the contracts were signed, a California appellate court treated "income" as synonymous with, inter alia, " 'revenue' " and rejected a claim that "income" from realty should include the reasonable rental value *not actually received*. (*Wells v. Wells* (1944) 64 Cal.App.2d 113, 115–116 [148 P.2d 126].)

Thus, "total revenues derived" under article 22(a) means the amount *actually* derived, not the value of what *might* have been derived, or the market value.[19]

### E. *Extrinsic Documents*

Plaintiffs contend various extrinsic documents show the term "total revenues" requires application of market rates in this case. We are not persuaded.

The massive amount of extrinsic evidence proffered at trial appears to have caused the trial court to assume the contract must be ambiguous as to market rates. The trial court found the "evidence of the extensive pre-contract evaluation and formulation of the SWP . . . and the intended contractual relationships between the DWR, the contractors, and the bondholders, fairly support an interpretation of the term 'total revenues' as the expected product of the full market value of all power generated by project conservation facilities whether the power was sold or used within the [SWP]." This fails to explain what *contract language* could plausibly carry the latent meaning of "market rates" when, as we have explained, article 22(a) and the statutes incorporated into the contract facially *preclude* such meaning.

▮▮▮ In determining whether language is ambiguous it is *essential* to tether extrinsic evidence to particular language: " 'The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not

---

[19] Of course, context prevails over abstraction. (See *Bates v. Porter* (1887) 74 Cal. 224, 240 [15 P. 732] [meaning of " 'revenue' " is "determined by the words with which it is connected"]; *In re C.C.* (2009) 178 Cal.App.4th 915 [100 Cal.Rptr.3d 746] ["The meaning of words is always contextual."]; cf., e.g., *Babcock v. Goodrich* (1874) 47 Cal. 488, 513 [interpreting a statute limiting liability against the "aggregate" of county revenue to refer to *estimated* county revenue].) But we see nothing in *this* contract to support the peculiar definition of "revenue" plaintiffs posit.

whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning *to which the language of the instrument is reasonably susceptible.*' " (*Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 391 [46 Cal.Rptr.3d 668, 139 P.3d 56], italics added (*Dore*).) Therefore, if " 'the language of the instrument' " cannot carry the meaning ascribed to it by the party claiming an ambiguity, " 'the case is over.' " (*Dore, supra*, 39 Cal.4th at pp. 392–393.)

We find the following quotation to be apt:

 "California finds meaning in contractual language in its applications. To avoid future disputes and to provide predictability and stability to transactions, courts attempt to interpret the parties' intentions from the writing alone, if possible. [Citations.] This is particularly true with documents relating to real estate transactions, which, when recorded, are intended to provide public notice and promote public reliance on their facial meaning.

"Ambiguities arise when contractual language reasonably may be susceptible to more than one interpretation based upon the offered evidence regarding the material facts. [Citation.] Under these circumstances, trial judges, acting as gatekeepers, may take a 'preliminary look' at proffered extrinsic evidence to determine ambiguity, because written words may have special meanings to the contracting parties that are not apparent on the face of the document itself. [Citation.]

"An agreement is not ambiguous merely because the parties (or judges) disagree about its meaning. *Taken in context, words still matter.* As Justice Baxter has pointed out, 'written agreements whose language appears clear in the context of the parties' dispute are not open to claims of "latent" ambiguity.' (*Dore, supra*, 39 Cal.4th at p. 396 (conc. opn. of Baxter, J.).)" (*Abers v. Rounsavell* (2010) 189 Cal.App.4th 348, 356 [116 Cal.Rptr.3d 860], italics added (*Abers*).)

The observation in *Abers* that hewing closely to the written page is important in real estate contracts applies with even *greater* force to the contract in this case: It was entered into between the state and MWD pursuant to statute, approved directly by the people, and implicitly approved by the Legislature. (See *Marquardt, supra*, 59 Cal.2d at pp. 181–182; 61 Ops.Cal.Atty.Gen., *supra*, at p. 379.) It is implausible to believe the parties would intend that "market rates" should reduce the Delta Water Charge, but redact that proposed term from the draft contracts and substitute "total revenues derived" therefor: Such a maneuver would obfuscate, not illuminate, the intent of the parties, and certainly would not "provide public notice and promote public reliance" on the "facial meaning" of the contract. (*Abers, supra*, 189 Cal.App.4th at p. 356.)

 It is well settled that extrinsic evidence cannot be used to add a provision to the contract that was omitted by the parties. (See *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 39 [69 Cal.Rptr. 561, 442 P.2d 641]; *Bernard v. State Farm Mutual Automobile Ins. Co.* (2007) 158 Cal.App.4th 304, 309 [69 Cal.Rptr.3d 700]; *A.B.C. Distrib. Co. v. Distillers Distr. Corp.* (1957) 154 Cal.App.2d 175, 185 [316 P.2d 71] ["Matters which were intentionally omitted from a contract may not be added under the guise of interpretation."].)

An explicit "market rate" provision was proposed but dropped, and it cannot be restored via extrinsic evidence untethered to contractual language.[20]

The trial court, after granting judicial notice of or otherwise provisionally admitting the extrinsic evidence, should have directed plaintiffs to identify which portions of the *contractual language* were rendered ambiguous by which pieces of extrinsic evidence. Placing this initial analytic burden on the party claiming extrinsic evidence is relevant to interpretation is appropriate, because "A party attacking a meaning succeeds only if the attacker can propose an alternative, plausible, candidate of meaning." (*Dye, supra,* 92 Cal.App.4th at p. 976.) That would have considerably lessened the trial court's burden. It is not enough for a party to unearth an archival document and assert it reveals a latent linguistic ambiguity.[21]

We now address in detail the various types of extrinsic evidence plaintiffs claim make article 22(a) susceptible of a meaning that requires the current market rates of power be used to reduce the Delta Water Charge.

---

[20] Plaintiffs contend dropping the market rate language was of no moment because "total revenues derived" means the same thing. In support, plaintiffs point to three *unadopted* contract drafts, but two included an explicit market rate provision, and the third defined a power credit in terms of the "net value accruing to the State," which also appears to carry the meaning of "market rate," as we discussed in connection with the article 30 surcharge. Obviously, article 22(a) has no such language. Citing *Main Street Landing, LLC v. Lake Street Assn.* (2006) 179 Vt. 583 [892 A.2d 931] (*Main Street*), plaintiffs also contend there is no evidence the market rate language was *negotiated out* of the contract. However, in that case there had been no showing that a party had seen an earlier draft or that a critical change "was negotiated" by the parties. (*Main Street, supra,* 892 A.2d at p. 936.) In contrast, here it is undisputed that the various draft contracts were exchanged between the parties.

[21] In a case involving claimed statutory ambiguity, we warned that the fact a document is an official document does not necessarily make it either judicially noticeable or relevant. (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 29 [34 Cal.Rptr.3d 520] ["Many attorneys apparently believe that every scrap of paper that is generated in the legislative process constitutes the proper subject of judicial notice. They are aided in this view by some professional legislative intent services."].)

### 1. *The Contracting Principles*

Plaintiffs begin with Governor Pat Brown's contracting principles, specifically principle No. 4, which in part proposed that when "any power is available for sale, it will be sold at its market value."[22]

One court has explained the *general* importance of the contracting principles in part as follows: "[T]he contracting principles and the MWD contract are particularly useful in interpreting this Act. They were matters of public record, widely publicized before the election. They represent a contemporary administrative directive, which was known to the voters at the time of the election. The voters were aware that all future water contracts would be implemented pursuant to the contracting principles, *and by voting for the Act they approved the contracting principles.* The contracting principles also were accepted by the Legislature, which, with knowledge of them, appropriated funds for the project in the Budget Act of 1960 [citation], thus indicating legislative approval of the administrative directive. [Citation.] *Both the contracting principles and the MWD contract are an important source of the Act's meaning, and the Act must be construed in light of their contents.*" (*Goodman, supra,* 140 Cal.App.3d at pp. 907–908, italics added.)

Plaintiffs view this passage as establishing the primacy of the contracting principles in interpreting the contract. But the general statement that the contracting principles were known to the voters and are relevant to interpreting the contract does not mean that every aspect of the principles was endorsed by the parties, the voters, or the Legislature. The contracting principles set forth the executive branch's initial *goals,* not what it eventually *obtained. Goodman* itself merely addressed the point that the contracts were

---

[22] In full, principle No. 4 provided as follows:

"The Project will require more power for pumping purposes than it will produce. Power required in the operation of the project must be paid for by the water users whether it is obtained from project or nonproject sources. Therefore, the costs of the project facilities producing the power is properly a cost of water supply and in the project cost allocation no separate allocation of the capital costs of power facilities will be made. The capital cost of power will be included in the costs allocated to water supply. The difference between the actual cost of power, that is, the amount necessary to repay the capital and operation and maintenance costs of the power facilities, and the market value of the power provides an economic benefit. A cost allocation study will be made with reference to power facilities for the purpose of determining the economic benefit to be derived from the use of project water.

"In addition, to the extent that from time to time any power is available for sale, it will be sold at its market value. Preference will be given to public agencies in such sale as required under existing law. The difference between the actual cost and the market value of such power will result in income to reduce project costs. This added income (power credit) will be applied, and the computed economic benefit will be made available, to reduce the cost of project water except for water used on land in single ownership in excess of 160 acres (320 acres in the case of community property)."

supposed to pay for all SWP expenses. (*Goodman, supra,* 140 Cal.App.3d at p. 908; see *Patton v. City of Alameda* (1985) 40 Cal.3d 41, 45 [219 Cal.Rptr. 1, 706 P.2d 1135] [discussing *Goodman*].) That particular portion of the contracting principles (principle No. 3) was fully implemented, and it bears more detailed discussion.

Plaintiffs contend DWR's discretion to set rates was not revealed to the voters and therefore granting DWR such discretion would result in a fraud on the voters, in part citing a prior decision of this court emphasizing the need to protect the integrity of voter-approved bond measures. (*Veterans of Foreign Wars v. State of California* (1974) 36 Cal.App.3d 688, 692–697 [111 Cal.Rptr. 750]; see *Peery v. City of Los Angeles* (1922) 187 Cal. 753, 767 [203 P. 992].) We reject plaintiffs' premise that DWR's discretion was unknown to the voters before Proposition 1 was adopted.

A critical component of the plan was that DWR would enter into contracts that would repay the project costs, and this point was stressed before the 1960 General Election. (See *Antelope Valley-East Kern Water Agency v. Local Agency Formation Com.* (1988) 204 Cal.App.3d 990, 993 [251 Cal.Rptr. 593]; *Goodman, supra,* 140 Cal.App.3d at pp. 905–906 & fn. 3.) In the official ballot materials, the Legislative Counsel explained that "surplus project revenues" would first be expended on the " 'State Water Facilities' " and when no longer needed for such purpose, "could be expended upon any facilities" of the SWP. (Ballot Pamp., Gen. Elec. (Nov. 8, 1960) analysis of Prop. 1 by Legis. Counsel, p. 3 (Ballot Pamphlet).) The Legislative Counsel also explained that DWR would "enter into contracts for the sale, delivery or use of water or power . . . subject to such terms and conditions as may be prescribed by the Legislature" so long as they did not impair the rights of outstanding bondholders. (*Ibid.*)

The proponents of Proposition 1 argued in relevant part: "The program will not be a burden on the taxpayer; no new state taxes are involved; the bonds are repaid from project revenues, through the sale of water and power. In other words, it will pay for itself." (Ballot Pamp., *supra,* argument in favor of Prop. 1, p. 3; see 61 Ops.Cal.Atty.Gen., *supra,* at pp. 380–381 [voters told it would be "an essentially closed, self-supporting system"].) The opponents did not address the sale of power.[23]

---

[23] The opponents argued the SWP was too big, too costly, and sacrificed Northern California water rights in favor of Southern California interests, a particular risk given the then recent adverse Special Master's proposed decision in *Arizona v. California* (1963) 373 U.S. 546 [10 L.Ed.2d 542, 83 S.Ct. 1468], to reduce California's allocation of Colorado River water. (Ballot Pamp., *supra,* argument against Prop. 1, p. 4.) The proponents, too, referred to this risk. (Ballot Pamp., *supra,* argument in favor of Prop. 1, p. 3.) Unfortunately, as feared by both

Thus, despite the contracting principles, the voters were *not* led to believe "market rates" for power would be charged. They were told that the project would pay for itself through the sale of water and power, which would be sufficient to repay the bondholders. They were also told DWR would have the authority to enter into contracts subject to legislative conditions. As required by law, the full text of the Burns-Porter Act was included in the ballot pamphlet,[24] including section 12931, which provided that facilities built by the act would be operated pursuant to the CVP act. (§ 12931; see Ballot Pamp., *supra*, text of Prop. 1, p. 22.) When Proposition 1 was presented to the voters, the CVP act already vested DWR with the authority to set power rates and cancel and take over contracts for the sale of water and power. (§§ 11454, subd. (a), 11455, 11670, 11671; see Stats. 1957, ch. 1932, §§ 293–294, 336–337, pp. 3410, 3417.) Thus, the voters understood they were *not* compelling the charging of *market* rates for power, as such a conclusion is inconsistent with the text, analysis, and official arguments presented to them, despite their presumed knowledge of the contracting principles.[25]

In short, the contracting principles do not override the language of the contract or applicable statutes, and do not render the contract ambiguous as plaintiffs posit.[26]

### 2. *Legislative Reports*

Plaintiffs rely on legislative reports favoring market rates, issued in early 1960. But as interveners stress, not all legislative reports favored using market rates, and a minority report not mentioned by plaintiffs explicitly opposed using market rates. As interveners point out, "The recommendations of these committees were just that—recommendations. They were not binding

---

sides, the Special Master's decision did ultimately reduce our Colorado River allocation. (See *Imperial, supra*, 152 Cal.App.4th at p. 21.)

[24] See Elections Code former section 1511. (Stats. 1939, ch. 26, p. 49; see Elec. Code, § 9084 [current language].)

[25] Interveners contend the valuation of Oroville power was of no interest to the voters, because it would not increase the burden *on taxpayers*. But they concede "The allocation of costs between water contractors may affect the rates that ratepayers pay for water in different areas of the state." In theory, had the ballot materials anticipated the issue in this case, voters might have perceived a benefit or detriment to their own water rates, depending on their location.

[26] In a separately headed claim, plaintiffs assert the contracting principles establish a "marriage between costs and benefits" inherent in the contracts, that Alternative C betrays that marriage, as shown by numerical comparisons plaintiffs use to argue it benefits contractors unequally, and that some had negative transportation variable charges, including during the energy crisis following market deregulation in California after 1996. (See generally *People ex rel. Brown v. Powerex Corp.* (2007) 153 Cal.App.4th 93, 97–99 [62 Cal.Rptr.3d 638].) But the contracting principles were aspirational, and the fact Alternative C benefits some contractors more than others does not show an ambiguity in article 22(a).

on the contracting parties, nor indicative of their intent."[27] Interveners correctly contend that what is important is that the Legislature had the power to change the contracts during the 1961 Regular Session, but did not. (See *Marquardt, supra,* 59 Cal.2d at pp. 181–182.)

Plaintiffs also contend legislative committees "were keenly aware of" section 11626, which gave preference to state agencies in awarding CVP contracts. Section 11625 provides that any entity may contract with DWR to buy or use water, power, or other project assets, but section 11626 provides: "In entering into and awarding contracts, in case of equal or equivalent offers . . . [DWR] shall grant preference to state agencies or other organizations not organized or doing business for profit but primarily for the purpose of supplying water or electric power to their own citizens or members." A Legislative Counsel opinion dated September 30, 1958, observes that section 11626 grants preferences only to public offers "which are equal or equivalent to offers made by private companies, or corporations organized for profit." It also observes that DWR may determine what *is* an equal or equivalent offer.

Plaintiffs argue, "It is illogical to believe that a Legislature so keenly aware of the no-preference-to-public-agencies mandate of section 11626 actually intended to authorize DWR to grant a preferential rate when it sold Oroville power to itself." This overlooks the fact DWR had the authority power to determine what an equivalent offer was, and assumes DWR granted itself a *preferential* rate, rather than an *equivalent* rate to what the utilities paid. Thus, we reject plaintiffs' claims based on section 11626.[28]

### 3. Public Statements

Plaintiffs complain that the trial court misinterpreted a January 20, 1960, speech by Governor Pat Brown announcing the contracting principles, and dispute the admissibility of a document reflecting that speech.

Plaintiffs fail to point out where they objected to this document, fail to properly head an argument in their opening brief contesting the trial court's ruling admitting this document, and bury their legal points in footnotes. We

---

[27] For example, one report opposed the acreage definition for large landholders, but such definition was agreed to by the parties, in the article 30 surcharge we have discussed.

[28] We need not address DWR's claim that section 11626 does not apply because DWR's act of, in effect, taking over the Power Sale Contract was not the "entering into" or "awarding" of a contract.

We do note that a March 1960 legislative report discussing section 11626 claimed "present state law contemplates sale of power at market rates . . . ." No citation was given to support the assertion that then present state law required market rates, and plaintiffs supply none in their briefing.

deem their contention forfeited. (See *Loranger, supra*, 184 Cal.App.4th at p. 858, fn. 9; *Utz v. Aureguy* (1952) 109 Cal.App.2d 803, 807–808 [241 P.2d 639] (*Utz*).)[29]

Moreover, plaintiffs concede the speech "added nothing of substance" to DWR statements made at a press conference about the contracting principles held the next day. DWR proposed that small landholders first would get a market value credit for surplus power revenues (lowering their Delta Water Charge), and then would pay actual power costs for deliveries, whereas large landholders would be charged market value for the power to deliver water (raising their Transportation Charge). But such statements, like the contracting principles, predate and cannot supersede the final contract language.[30]

### 4. *Conclusion as to Extrinsic Documents*

█ We see nothing in the contracting principles, legislative reports, or public statements made before the MWD contract was agreed upon, that signals the meaning of "total revenues derived" can plausibly mean "market value." Although extrinsic evidence may be used to show a *latent* meaning, that meaning must *reside in* the document. (See *Dore, supra*, 39 Cal.4th at p. 391; *Abers, supra*, 189 Cal.App.4th at pp. 356–357.) Plaintiffs' extrinsic evidence does not show any ambiguity *in the contract*.[31]

### F. *Conclusion as to Market Rates*

For all of the reasons we have outlined *ante*, we disagree with the trial court's finding that the contract is ambiguous in the manner posited by plaintiffs. The contract cannot plausibly be read to compel DWR to credit the Delta Water Charge with the market value of Oroville power, rather than the "total revenues derived" from that power, as provided in article 22(a).

---

[29] Their headed argument in the reply brief comes too late. (See *Utz, supra*, 109 Cal.App.2d at p. 808.)

[30] Further, it is not unprecedented to rely on speeches by a chief executive to ascertain executive policy. Indeed, another California court quoted part of Governor Brown's speech to illustrate the fact that the project would be "self-supporting." (*Goodman, supra*, 140 Cal.App.3d at p. 906, fn. 3.)

And because plaintiffs concede the speech was cumulative in content as compared to the press conference, even if the trial court erred in considering the speech, such error was harmless. (Cal. Const., art. VI, § 13; Evid. Code, § 353, subd. (b).)

[31] Of course, in cases of mutual mistake or scrivener's error, a court may reform a contract to add a concept that is not present in the contractual language. (See Civ. Code, § 3399; *California Pac. Title Co. v. Moore* (1964) 229 Cal.App.2d 114, 116 [40 Cal.Rptr. 61].) But that is not the kind of relief plaintiffs seek herein.

## II

### *"Resales" of Oroville Power*

In their initial briefing, plaintiffs challenged the trial court's conclusion that when DWR sells SWP "pool" power on the open market, any "profits" traceable to Oroville power do not need to be credited as part of the "total revenues" that reduce the Delta Water Charge under article 22(a). We requested supplemental briefing to clarify the positions of the parties on this question.[32]

We conclude that DWR has acted within its statutory authority in the manner in which it has treated "profits" due to resales of Oroville power it has already purchased for the SWP, and any arguable contractual ambiguity regarding this treatment was properly resolved against plaintiffs by application of the practical construction rule.

DWR posits that it manages a systemwide "pool" or "portfolio" of energy from several sources, and once it pays for Oroville power and adds it to that pool, it is no longer Oroville power, the revenue from which must be used to reduce the Delta Water Charge. The power it "sells" to the SWP—acting "on both sides of the transaction"—becomes part of the system pool, either used within the SWP or sold or traded outside the system, depending upon project needs, and, "In either case, the value of this power . . . offsets the cost of transporting water" by reducing the Transportation Charge.[33]

SWP's total power includes Oroville power as well as power from the various recovery plants (see fn. 10, *ante*), power bought from utilities, and power from "off-aqueduct" plants located away from SWP facilities, and DWR consistently treated all of this as a system pool of energy.[34]

DWR's view is reflected by DWR's long range energy program described in Bulletin 132-78, which contemplated sales of excess power resulting from

---

[32] Interveners contend plaintiffs failed to preserve this issue. But the issue was addressed in the statement of decision, discussed—although obliquely—in plaintiffs' opening brief, and both DWR and interveners discussed it in their initial briefing, though interveners also objected that it had not been properly raised. In any event, we may order supplemental briefing on legal issues whether or not raised by the parties. (See *Walton v. City of Red Bluff* (1991) 2 Cal.App.4th 117, 129–130 [3 Cal.Rptr.2d 275].)

[33] As interveners point out, system power sales also reduce the Delta Water Charge in small measure, because such sales partly defray the cost of power used to operate the project conservation facilities themselves.

[34] Some "off-aqueduct" power comes from the coal-fired Reid Gardner Power Station in Nevada, but on June 11, 2012, during the pendency of this appeal, DWR announced that it will discontinue this source in July 2013, to reduce SWP's total "greenhouse gas" emissions. (See <http://www.water.ca.gov/climatechange/CAP.cfm> [as of Feb. 15, 2013].)

"total Project resources as a whole" and anticipated Oroville power would be "melded with other existing and future project power resources." It is also reflected by Orrick, Herrington & Sutcliffe's bond opinions in 1977 and 1982, which DWR interprets to support its position, reasoning generally as follows:

■ There are two types of bonds at issue, revenue bonds under the CVP act and general obligation bonds under the Burns-Porter Act. The Oroville powerplants were built with two tranches of CVP revenue bonds, retired in 1994. Thus, as DWR explains, there are no longer any bonds *directly* secured by the revenue from Oroville power. However, the state's General Fund is reimbursed "by revenue derived from the facilities financed by the general obligation bonds." (See §§ 12936, 12937, subd. (a).) The Oroville power-plants were by statute treated as "separate and apart" from the CVP, and the *revenue* from the bonds to construct them was kept separate from the *revenue* from general obligation bonds used to fund other parts of the SWP. (§ 11260; see *Warne, supra*, 60 Cal.2d at pp. 581–586, 588, 592–593.) When money used by DWR to buy Oroville power pursuant to the State Power Contract (now Project Order No. 36) is transferred from the "California Water Resources Development [(i.e., general obligation)] Bond Fund" (see § 12937, subd. (b)) into the segregated "Central Valley Water Project Revenue Fund" (see §§ 11815, 11818), that money is revenue from the sale of Oroville power and, as provided by article 22(a), is credited against the Delta Water Charge. Money from the sale of SWP system *pool* power—some of which may have come from Oroville—must be kept in the general obligation bond fund, and *cannot* be credited against the Delta Water Charge. As stated by our Supreme Court, "revenues from facilities constructed with [Burns-Porter Act funds have] no application to revenues from facilities financed under the Central Valley Project Act." (*Warne, supra*, 60 Cal.2d at p. 585; see § 12937, subd. (b).) In short, as correctly stated by outside bond counsel, "Having thus changed the character of the power . . . so that it is no longer Oroville Power [but has joined the SWP system power pool], moneys received by [DWR] from the subsequent sale of that power" are not "revenue" under article 22(a).

Section 11670 authorized DWR to engage in self-dealing by taking over the 1967 Power Sale Contract. That statute provides in full: "Any contract or lease made by the department with any person, other than a state agency, providing for the furnishing by the department of water, the use of water, water storage, electric power, or other service for resale shall be subject to cancellation by the department upon five years' notice, and such a contract or lease shall be so canceled in whole or in part whenever the State or *any financially responsible state agency* makes application for the water, use of water, water storage, electric power, or other service, or any part thereof, covered by the contract or lease and *enters into a contract or lease binding itself to take the water, use of water, water storage, electric power, or other*

*service, or any part thereof, and pay for it at a rate or price at least equal to that specified in the contract or lease to be canceled and for a period at least equal to the unexpired portion of the term of such contract or lease."* (§ 11670, italics added.)

DWR was a "financially responsible state agency" that bound itself to "pay for" Oroville power at the same price paid by the utilities, as permitted by section 11670. Section 11671 required that DWR had to "receive and be paid a *total revenue or consideration* at least equal to that which would be received by it were the contract . . . not canceled, and within the unexpired portion of the term of the contract." (§ 11671, italics added.) DWR was not required to "receive and be paid" a penny more. The "total revenue or consideration" described in section 11671 effectively equates to the "total revenues derived" from the sale of Oroville power described in article 22(a).

Thus, DWR's interpretation of "total revenues" to exclude resales traceable to Oroville power is both plausible and statutorily authorized.[35]

Indeed, having followed the statute by agreeing to "pay for" the Oroville power at the same rate that the utilities paid, by using SWP monies, DWR transferred any right to that power to *SWP*. By common sense and common definitions, when one has paid for something, one *owns* it. (See 2 New Century Dict., *supra*, at p. 1265 [to pay is to "compensate, as for goods supplied or services rendered"]; Little, Shorter Oxford English Dict. (3d ed. 1944) p. 1452.) Indeed, plaintiffs at argument appeared to concede as much. Had the Legislature intended some other meaning, it would not have used the term "pay" when it adopted section 11670. And, as explained earlier, the water supply contracts explicitly incorporated the CVP statutes, including section 11670. Therefore, it was within the contemplation of the parties that DWR would "pay for" and therefore *own* the Oroville power, which is no longer part of the "total revenues" used to reduce the Delta Water Charge.

Plaintiffs contend that although Oroville power sold to DWR creates revenue "derived" from the "sale or other disposal" of that power under article 22(a), if and when DWR chooses to resell *that same power*, it derives

---

[35] Interveners point out that DWR has engaged in some *in-kind* power trades to exploit the variable value of "on-peak" and "off-peak" electricity. This would make a hypothetical formula for crediting resales to article 22(a) *extremely complex*, though not necessarily *impossible*, as both DWR and interveners conceded at argument. We also acknowledge interveners' point, emphasized at argument, that no such formula is in the 1960 MWD contract, which of course predated the 1967 Power Sale Contract, the 1973 energy crises, and DWR's 1983 assumption of the 1967 Power Sale Contract. But difficulty of calculation would not of itself defeat plaintiffs' claim, if profits from resales or trades were, legally, part of the "revenues" described by article 22(a). Further, as plaintiffs point out, it would not seem particularly difficult for DWR to account for those cash sales of power that it does make.

*additional* revenue therefrom. They contend DWR's relationship with bond-holders is irrelevant to DWR's contractual relationship with them.[36] Further, as suggested by a question we posed to the parties, they emphasize that *unlike* DWR, the utilities who were parties to the 1967 Power Sale Contract owed no contractual duties toward plaintiffs. (See fn. 13, *ante*.) In short, plaintiffs view the system power pool concept, while perhaps convenient for DWR's internal purposes, as irrelevant to them. They argue that, to the extent it deprives them of the full benefit of Oroville revenues, it is a "shell game" that results in "a massive, extra-contractual shift of the benefit of power generated by the [Oroville] facilities . . . to heavy users of transportation." In short, plaintiffs contend DWR made a pile of money by taking over the Power Sale Contract, and uses it to lower the cost of providing water to Southern California.

Even if we assumed, for the purposes of argument, that plaintiffs have tendered an alternate permissible candidate of meaning, we would uphold the trial court's finding that DWR's candidate of meaning is correct, based on evidence that, for *at least* 20 years, plaintiffs accepted DWR's interpretation without formal protest.[37]

The statement of decision details overwhelming evidence credited by the trial court—including by some of plaintiffs' witnesses—showing that, no later than *1983*—if not *1978*—the contractors knew DWR would value power and allocate revenue in accordance with Alternative C, and thereafter DWR issued yearly statements showing that resales were not credited toward article 22(a)'s "total revenues," yet plaintiffs did not raise the issues tendered by this case until *2003*. Indeed, a 1988 KCWA report emphasized at oral argument *praised* DWR's handling of power sales, which were used "to hold down increases" in system power costs.

*Factually*, plaintiffs contend they made "annual generic protests of DWR's cost allocations under the Contracts" well before 2003. But on appeal, they

---

[36] We observe again, however, that article 5 states the contract was entered into "for the direct benefit" of general obligation bondholders.

[37] In their supplemental brief, plaintiffs incorporate their discussion of the "practical construction" rule made in their *other* briefs, which focused on the rule as it related to the "market rate" question. The evidence credited by the trial court in applying the rule to the "market rate" issue speaks equally to the "resale" issue.

With their supplemental brief, plaintiffs sought judicial notice of a brief MWD filed on October 16, 1963, in *Warne, supra*, 60 Cal.2d 579. We do not normally take judicial notice of materials not presented at trial. (*People v. Preslie* (1977) 70 Cal.App.3d 486, 493 [138 Cal.Rptr. 828]; see *Reserve Insurance, supra*, 30 Cal.3d at p. 813.) Plaintiffs offer no persuasive reason to depart from the general rule in this case. (See *Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325–326 [48 Cal.Rptr.2d 87, 906 P.2d 1242].) Accordingly, we deny the request for judicial notice.

rely on one 1994 protest letter. This was one of what the trial court described as "typically collective letters" sent to DWR by a group of contractors *that included some plaintiffs and some interveners.* One protest reads: "6. Project energy costs and related activities as follows: [¶] a. All costs insofar as such costs are affected by project purpose allocations." This does not describe the resale issue, and there is no reason why a collective letter would raise an issue about which the collective's constituent members had directly opposed financial interests. Further, the author of the letter, a former KCWA general manager, conceded he had "[n]ot specifically" thought of the present dispute when that letter was drafted, and there was other evidence to that effect. Accordingly, the trial court's finding that no claim was made that DWR breached the contract until 2003 stands *factually* unrebutted.[38]

■■■ *Legally*, the trial court found this long course of dealings triggers the "practical construction" rule, generally providing: "When one party performs under the contract and the other party accepts his performance without objection it is assumed that this was the performance contemplated by the agreement." *(Bohman v. Berg* (1960) 54 Cal.2d 787, 795 [8 Cal.Rptr. 441, 356 P.2d 185] *(Bohman).)* The rule has been explained in more detail as follows: "It is to be assumed that parties to a contract best know what was meant by its terms, and are the least liable to be mistaken as to its intention; that each party is alert to his own interests, and to insistence on his rights, and that whatever is done by the parties contemporaneously with the execution of the contract is done under its terms as they understood and intended it should be. Parties are far less liable to have been mistaken as to the intention of their contract during the period while harmonious and practical construction reflects that intention, than they are when subsequent differences have impelled them to resort to law, and one of them then seeks a construction at variance with the practical construction they have placed upon it. The law, however, recognizes the practical construction of a contract as the best evidence of what was intended by its provisions." *(Mitau v. Roddan* (1906) 149 Cal. 1, 14–15 [84 P. 145] *(Mitau).)*[39]

---

[38] Plaintiffs contend they did not agree with DWR, which assured them Alternative C "was non-binding and could be revisited at any time." But they rely on statements made during the committee proceedings, not statements made *after formal adoption of Alternative C.* For example, some contractors objected that Alternative C would unfairly benefit contractors south of the Tehachapis, and in a letter dated March 31, 1977, KCWA argued it was "not consistent" with the contract. And a February 24, 1978, letter stated KCWA's *tentative belief*—not formally adopted by KCWA's board—that setting revenues at market rate would be proper. But no formal claim of *breach of contract* was made until KCWA's *2003* protest letter.

[39] Public contracts may not be subject to the practical construction rule where there has been collusion or dereliction of duty by public officials, leading to a failure to enforce public rights. (See 10A McQuillin, Law of Municipal Corporations (3d ed. 2009) Contracts in General, § 29:122, pp. 202–203; *City of Burlington v. Burlington Traction Co.* (1924) 98 Vt. 24, 39–41 [124 A. 857, 861–862]; *National Waterworks Co. v. School District No. 7* (W.D.Mo. 1882) 48 F.

The contractors herein were highly sophisticated. (Cf. *Crestview Cemetery Assn. v. Dieden* (1960) 54 Cal.2d 744, 751 [8 Cal.Rptr. 427, 356 P.2d 171] ["we must keep in mind [the contract parties] were not novices or inexperienced"].) The record shows that none were too shy, too ignorant, or too weak to assert *any* of their rights.[40] Yet they remained inexplicably silent.

In arguing that their long—*and still unexplained* (see fn. 41, *post*)—failure to formally protest DWR's practices is not significant, plaintiffs rely on *Riverside Heights Water Co. v. Riverside Trust Co.* (1906) 148 Cal. 457 [83 P. 1003] (*Riverside Heights*). That case does not support their contention.

In *Riverside Heights*, a canal was built under contracts calling for landowners along its course to pay for maintaining the canal, in exchange for the right to certain amounts of water. Later, the canal was extended to service *other* lands, across an arroyo. (*Riverside Heights, supra*, 148 Cal. at pp. 460–461.) The trial court found the landowners were not liable for the expenses of maintaining the canal extension because the "canal" referred to in their contracts was the original canal. (*Riverside Heights, supra*, at pp. 461–463.) Our Supreme Court held the trial court properly considered extrinsic evidence to conclude no canal extension had been anticipated. (*Id.* at pp. 464–466.)

The portion of the opinion relied on by plaintiffs reads: "It is claimed that the respondent, by making payments of the amounts claimed by the appellant and by other acts which are said to show a recognition of or acquiescence in the claim of an obligation so to do, has, by estoppel or otherwise, bound itself to a construction of the contracts in accordance with appellant's claims and contrary to the findings. We think this claim is untenable. There are no circumstances from which an estoppel could arise. And while in the case of an ambiguous contract the conduct of the parties may be proved to aid in its interpretation, yet it is not conclusive evidence thereof, and it may be disregarded in favor of more satisfactory evidence to the contrary. With the conclusion of the lower court on such conflicting evidence we cannot interfere." (*Riverside Heights, supra*, 148 Cal. at p. 467.)

---

523, 524–525.) But in California, public contracts normally are interpreted by the same rules as private contracts (Civ. Code, § 1635; see *Ribeiro v. County of El Dorado* (2011) 195 Cal.App.4th 354, 370 [125 Cal.Rptr.3d 577]), and there is no explicit claim of collusion or dereliction of duty, though there is permissible self-dealing (see pt. I, *ante*).

[40] For example, the contractors used outside accountants who were given access to all DWR data they requested in order to audit the annual DWR water bills. Article 29(i) sets forth a protest procedure to resolve disputed bills.

Thus, *Riverside Heights* did not hold that a failure to object to payments was generally *inadmissible* or *unpersuasive* on the issue of mutual intent at the time of contracting. As we have pointed out in a prior decision, it merely upheld the trial court's conclusion as to the intention of the parties *in that particular case*, which was based on other evidence of mutual intent. (*Caletti v. State* (1941) 45 Cal.App.2d 302, 305–306 [114 P.2d 9].) Properly read, *Riverside Heights* does no more than support the view that when extrinsic evidence of intent is in conflict, the trial court's resolution of that conflict will be upheld if it is supported by substantial evidence. (*Riverside Heights, supra*, 148 Cal. at p. 467 ["With the conclusion of the lower court on such conflicting evidence we cannot interfere."]; see *Winet, supra*, · 4 Cal.App.4th at pp. 1165–1166.)

Plaintiffs also contend the 1967 Power Sale Contract reflected a market rate for power, and argue this undermines the "practical construction" rule as applied to the *subsequent* conduct of the parties, because Alternative C represented "a belated change" in DWR's "consistent implementation" of the contracts between contractual inception and 1983. Even if we assume the Power Sale Contract reflected long-term market rates (see fn. 9, *ante*), that does not mean the subsequent conduct of the parties cannot shed light on their intentions *at the time of the MWD contract in 1960*. Instead, evidence of plaintiffs' delay between 1983 and 2003 was admissible and probative on the question whether DWR accurately interpreted "total revenues" in article 22(a) so as to exclude system power sales or trades. (See *Oceanside 84, Ltd. v. Fidelity Federal Bank* (1997) 56 Cal.App.4th 1441, 1450–1451 [66 Cal.Rptr.2d 487] [increase in rates for five years "was consistent and in no way deceptive" and party's "payments without objection and the failure to question the method of calculation" spoke to contractual intent]; *Okun v. Morton* (1988) 203 Cal.App.3d 805, 816–819 [250 Cal.Rptr. 220] [two-year period]; see also *Employers Reinsurance Co. v. Superior Court* (2008) 161 Cal.App.4th 906, 922 [74 Cal.Rptr.3d 733] ["It should not matter whether the parties' agents who originally drafted the contract participated in the performance, or have long since left the scene."].)[41]

Accordingly, assuming plaintiffs have tendered an ambiguity regarding allocation of the proceeds or value of system power pool sales or trades, the

---

[41] Even in their reply brief, plaintiffs offer no explanation for their long delay, they merely argue their delay has "no relevance to what Contracts entered decades before were intended to mean. Alleged delay in challenging an erroneous interpretation of a contract should not lock it in place forever despite its currently ongoing and unacceptable effects." This view conflicts with the well-settled practical construction rule. (See *Bohman, supra*, 54 Cal.2d at p. 795; *Mitau, supra*, 149 Cal. at pp. 14–15.)

long course of dealing between the parties clarifies that ambiguity against them.

## III

### *The Bad Faith Claim*

After issuing what it characterized as the "interlocutory judgment" interpreting the contract, the trial court granted DWR judgment on the pleadings. On appeal, plaintiffs contend they pleaded a viable claim for breach of the covenant of good faith.[42] We disagree.

The operative complaint alleged DWR acted in bad faith by "failing to credit all of the benefits derived from the sale or other disposition of electricity generated by the Hyatt-Thermalito generating facilities against the 'Delta Water Charge' rather than against the 'Transportation Charge.'" Plaintiffs contend that *even if* the contract does not *require* market rates, DWR had an obligation, in its good faith administration of the contracts, to apply a market rate.

We agree with plaintiffs that, "The law implies in every contract . . . a covenant of good faith and fair dealing. 'The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the agreement's benefits.'" (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 720 [68 Cal.Rptr.3d 746, 171 P.3d 1082].)[43] But there is no bad faith when a party does that which is explicitly allowed by an agreement, or declines to renegotiate an agreement. (See *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 373–376 [6 Cal.Rptr.2d 467, 826 P.2d 710] (*Carma*); *Storek & Storek, Inc. v. Citicorp Real Estate, Inc.* (2002) 100 Cal.App.4th 44, 61–64 [122 Cal.Rptr.2d 267].)

---

[42] We deem all other theories raised in the trial court but not briefed on appeal to be abandoned. (See 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 701, p. 769.)

[43] Further, articles 38 and 39 provide that, "Where the terms of this contract provide for action to be based upon the opinion, judgment, approval, review, or determination of either party hereto, such terms are not intended to be and shall never be construed as permitting such opinion, judgment, approval, review, or determination to be arbitrary, capricious, or unreasonable" and the DWR Director "shall be responsible for all discretionary acts, opinion, judgments, approvals, reviews, and determination required . . . under the terms of this contract." Contrary to DWR's and interveners' evident view, these articles, in addition to the Water Code, preclude DWR from acting in an "arbitrary, capricious, or unreasonable" manner against the water contractors. (See *Marquardt, supra,* 59 Cal.2d at p. 196.) On the other hand, they also refute plaintiffs' repeated claim, including at oral argument, that the "word 'discretion' never appears" in the contract.

 The Legislature gave DWR the authority to set rates by statutes incorporated into the contract, so long as the rates were *sufficient* to operate the system and pay off the bonds. (§§ 11454, subd. (a), 11455.) Other statutes permitted DWR to assume the 1967 Power Sale Contract, if DWR paid at least the same amount the utilities paid. (§§ 11670, 11671.) Plaintiffs assert it would be bad faith for DWR to arbitrarily value Oroville power. We agree the contract precludes DWR from acting arbitrarily. Indeed, DWR's outside bond counsel explained in 1977 that DWR cannot "use Oroville Power without paying for it" and "Any determination" regarding payment "must be made in good faith." That is consistent with articles 38 and 39 of the contract. (See fn. 43, *ante*.) But we disagree that DWR acted arbitrarily in choosing to value the power at the *same* rate as called for by the now cancelled 1967 Power Sale Contract, rather than reassessing the value: That was an outcome explicitly confided to DWR's discretion by statute, and therefore cannot constitute bad faith. (*Carma, supra*, 2 Cal.4th at pp. 373–376.) Therefore plaintiffs have not alleged bad faith to date.[44]

## IV

### *The Cross-appeal*

Interveners concede their cross-appeal is moot if we affirm the judgment against plaintiffs. We agree. Because we affirm, we shall dismiss the cross-appeal as moot.[45]

---

[44] We need not address the alternative defense contention that plaintiffs' bad faith claim is merely "duplicative" of their contractual claims. (Cf. *Bionghi v. Metropolitan Water Dist.* (1999) 70 Cal.App.4th 1358, 1370 [83 Cal.Rptr.2d 388].)

We note that DWR appears to believe it could maintain the 1967 50-year power rate forever, under its "discretion" to operate the SWP. Discretion is delimited by the legal standards applicable to its exercise, and public officials have no discretion to depart from such legal standards. (See *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 443 [261 Cal.Rptr. 574, 777 P.2d 610]; *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297–1298 [255 Cal.Rptr. 704].) DWR may not act arbitrarily when it values hydropower (see fn. 43, *ante*), and has no discretion to waste water resources (see Cal. Const., art. X, § 2). We have upheld DWR's view that it can "step into the shoes" of the utilities and credit the Delta Water Charge with the same amount the utilities paid, because of statutes explicitly allowing that practice. But on November 29, 2017, the Power Sale Contract *would have* expired, and Project Order No. 36 *does* expire. We decline to adjudicate in this appeal what DWR must do to determine an appropriate power rate after that date, because that issue was not directly raised or briefed by the parties, or addressed by the trial court.

[45] We deny as moot plaintiffs' motion to dismiss the cross-appeal based on their theory that interveners were not aggrieved by the judgment and thus lacked standing to cross-appeal.

## DISPOSITION

The judgment is affirmed. The cross-appeal is dismissed as moot. Plaintiffs (except Dudley Ridge Water District, which did not appeal the judgment) shall pay the appellate costs incurred by DWR and interveners. (Cal. Rules of Court, rule 8.278.)

Blease, Acting P. J., and Hull, J., concurred.